[S.F. No. 23823. Aug. 15, 1979.]

CALIFORNIA MANUFACTURERS ASSOCIATION et al.,
Petitioners, v.
PUBLIC UTILITIES COMMISSION et al., Respondents;
PACIFIC GAS AND ELECTRIC COMPANY, Real Party in Interest.

[S.F. No. 23881. Aug. 15, 1979.]

CALIFORNIA MANUFACTURERS ASSOCIATION et al.,
Petitioners, v.
PUBLIC UTILITIES COMMISSION et al., Respondents;
SOUTHERN CALIFORNIA GAS COMPANY, Real Party in Interest.

838

## COUNSEL

Gordon E. Davis, William H. Booth, Brobeck, Phleger & Harrison, Robert D. Raven, James J. Garrett, Charles R. Farrar, James P. Bennett, Morrison & Foerster, Robert L. Schmalz, J. Randolph Elliott, John L. Frogge, Jr., Kenneth M. Robinson, Donald H. Ford, Overton, Lyman & Prince and Bill B. Betz for Petitioners.

Janice E. Kerr, Hector Anninos, Timothy E. Treacy and Walter H. Kessenick for Respondents.

Malcolm H. Furbush, Robert Ohlbach, Shirley A. Woo, Thomas D. Clarke, and Leslie E. LoBaugh, Jr., for Real Parties in Interest.

## OPINION

**RICHARDSON, J.**—Petitioners in these consolidated proceedings challenge certain decisions of the Public Utilities Commission (commission) which purport to dispose of refunds received by Pacific Gas and Electric Company (PG&E) and Southern California Gas Company (SoCal), real parties in interest, from some of their interstate natural gas suppliers, pursuant to orders of the Federal Power Commission (FPC) now the Federal Energy Regulation Commission. We refer to these refunds *from suppliers* as "rebates" to distinguish them from "refunds" *to customers.*

In Decision No. 88261 the commission applied rebates received by PG&E to the company's "gas balancing account" thus deferring a prospective rate increase requested by the utility. In Decision No. 88751, as modified by Decision No. 89049, similar treatment was accorded

rebates received by SoCal. ■■■ We agree with petitioners' contention that the rebate funds must instead be returned to current and, insofar as practical, to *prior* customers of the utilities, in proportion to the gas usage of such customers *during the periods to which the rebates relate.* Accordingly, we will annul both decisions in part and remand the cases to the commission for further proceedings.

During the period 1972-1976, when PG&E and SoCal were charged increased natural gas rates by their interstate suppliers, these utilities sought to pass on these higher rates to customers, and obtained from the commission the authority to do so. In each instance, the supplier rate increases to the utilities were approved by the FPC on a contingent basis only, the FPC reserving jurisdiction to determine that the approved supplier rates were "excessive" thus eventually requiring appropriate rebates to the purchasing utilities. Accordingly, the commission-approved tariffs under which these increases were passed through to utility ratepayers consistently provided that any amounts reimbursed to PG&E and SoCal by their suppliers under FPC order would be "refund[ed]" to "customers" of the utilities.

During 1977, rebates were received by both utilities for "excessive" charges paid during the 1972-1976 period, and by October 1 PG&E was holding accumulated rebates approximating $52.4 million, and SoCal held about $75.6 million in similar supplier reimbursements.

In July 1977, PG&E filed with the commission Application No. 57481, requesting a prospective rate increase to offset approximately $75.3 million in anticipated natural gas cost increases during the ensuing year. SoCal filed a similar application, No. 57573, in September 1977, citing approximately $21 million in additional revenue which it deemed necessary to meet similar expected cost increases. The concept of the allocation of the accumulated supplier rebates for this purpose originated with the commission staff not the utilities.

Petitioners, except for California Manufacturers Association, are industrial concerns, each of which received substantial gas service from one or both utilities during the 1972-1976 period. Because of the scarcity and generally rising price of natural gas, and because commission-approved rate designs encouraged low priority gas users to switch to the use of less precious alternative fuels, the industrial petitioners sharply curtailed their gas usage since 1976. Accordingly, if the supplier rebates

in question are applied against *future* rates, as the commission proposes, petitioners, having substantially reduced their gas consumption, will not share in the benefit of the rebates to a degree proportionate to the overcharges to which they were previously subjected during the 1972-1976 period of their heavier gas usage.

In Decision No. 88261, the commission found PG&E's total additional annual gas purchase revenue requirement to be $82.4 million and ordered the $52.4 million in accumulated supplier rebates transferred in their entirety to the utility's "gas balancing account," thus to be credited against the prospective rate increase otherwise necessary. This, together with a $36.9 million credit already in the balancing account, permitted a complete deferral of PG&E's total requested rate hike. The excess credit in the account remains available for future use. The commission announced its intention to treat future supplier rebates in a similar manner.

In Decision No. 88751, as modified, the commission found SoCal's additional annual gas purchase revenue requirement to be $18.5 million which included the effect of a negative balance in the utility's "purchase gas adjustment balancing account." The entire $75.6 million in supplier rebates held by SoCal was ordered transferred to this balancing account as a credit against present and future rate increases.

Petitioners do not challenge the commission's findings and conclusions with respect to the revenue requirements of the utilities. They argue, however, that the commission's disposition of the supplier rebates is improper for several reasons, the first of which is that the placement of the supplier rebates into the utilities' "balancing accounts" violated Public Utilities Code section 453.5. (All statutory references are to that code, unless otherwise cited.)

Section 453.5, enacted in 1977, provides: "Whenever the commission orders rate refunds to be distributed, the commission shall require public utilities to pay refunds to all current utility customers, *and, when practicable, to prior customers,* on an equitable pro rata basis without regard as to whether or not the customer is classifiable as a residential or commercial tenant, landlord, homeowner, business, industrial, educational, governmental, nonprofit, agricultural, or any other type of entity. [¶] For the purposes of this section, 'equitable pro rata basis' shall mean *in proportion to the amount originally paid for the utility service involved, or in*

*proportion to the amount of such utility service actually received.* [¶] Nothing in this section shall prevent the commission from authorizing refunds to residential and other small customers to be based on current usage." (Italics added.)

There is no challenge to the constitutionality of section 453.5. Accordingly, where it applies, "refunds" which are ordered "distributed" by the commission must be allocated according to the statutory formula; *present* customers (except for small residential users) must be compensated *on the basis of their prior usage* to which the refund corresponds, and, where practical, *prior* customers must also participate *to the extent of the overcharges which they previously paid.*

Utility "balancing accounts" have a unique economic purpose and function. These accounts are intended to prevent a utility from accumulating excessive profit or sustaining loss because of abnormal variations in a single item of cost, such as natural gas purchased from suppliers. Rates for a particular test period are set on the basis of the utility's *estimated* costs and revenues during that time. The utility then records the difference between the estimate and its actual cost experience. This difference, if in the utility's favor, is credited to the balancing account as an overcollection. If, on the other hand, costs are higher than anticipated, a debit, or undercollection, is recorded in the account. Rates for *subsequent* periods are then adjusted to return the balancing account toward zero. The result is that *recent past* differences between actual and estimated costs and revenues are reflected in *future* rate levels. (See, e.g., *Southern Cal. Edison Co.* v. *Public Utilities Com.* (1978) 20 Cal.3d 813, 828 [144 Cal.Rptr. 905, 576 P.2d 945]; *City of Los Angeles* v. *Public Utilities Com.* (1975) 15 Cal.3d 680, 691-692 [125 Cal.Rptr. 779, 542 P.2d 1371].) Accordingly, any "return" to ratepayers of utility "overcollections" recorded in the "balancing account" inures only to the benefit of *current* utility customers, and only in proportion to their *current and future use* of utility services. *Past* ratepayers obtain no benefit at all from the "balancing account" adjustment. (See Kuersteiner & Herbach, *The Robin Hood Doctrine: Is it the Official Refund Policy of the California Public Utilities Commission?* (1978) 12 U.S.F. L.Rev. 655, 670.)

The use of balancing accounts in appropriate circumstances is specifically mandated by another provision of the code. Section 792.5, adopted in 1976, provides: "Whenever the commission authorizes any change in rates reflecting and passing through to customers specific changes in costs,

except rates set for common carriers, the commission shall require as a condition of such order that the public utility establish and maintain a reserve account reflecting the balance, whether positive or negative, between the related costs and revenues, and the commission shall take into account by appropriate adjustment or other action any positive or negative balance remaining in any such reserve account at the time of any *subsequent* rate adjustment." (Italics added.)

Because sections 453.5 and 792.5 thus, arguably, present conflicting legislative directions as to the disposition of reserves accumulated by a utility, we must therefore determine the scope of section 453.5 which was adopted more recently. The parties' contentions on that issue center upon the meaning of the section's introductory phrase, "Whenever the commission orders *rate refunds* to be *distributed, . . .*" (Italics added.)

Petitioners, on the one hand, urge that the statutory term "rate refunds" includes those "refunds" ordered in the 1972-1976 tariff approvals, and that the commission "distributed" such "rate refunds" when it allocated to the utilities' balancing accounts those specific supplier rebates reserved for "refund" in the tariffs. Hence, it is asserted, the commission action, in directing benefits of the rebate to flow entirely to future users, violated section 453.5, because it manifestly did not adhere to the statutory allocation formula.

The commission, on the other hand, adopting a more narrow interpretation, argues that "rate refunds" are "distributed" under section 453.5 only when the commission, by its order disposing of excess funds held by a utility, decides to return the money as a "refund." According to the commission, its 1977 orders used the supplier rebates other than as a "refund" and did not "distribute" them; hence, the commission contends, section 453.5 never became applicable.

The interplay of the terms "orders," "rate refunds," and "distributed," as used in section 453.5 is not rendered facially clear by reference either to the dictionary (see Webster's New Internat. Dict. (3d ed. 1961) pp. 660, 1910) or to other statutes or prior decisions involving "refunds." (See, e.g., § 1766 [disposition of "refund" where stay of rate reduction is vacated by Supreme Court]; *City of Los Angeles* v. *Public Utilities Commission* (1972) 7 Cal.3d 331, 355 [102 Cal.Rptr. 313, 497 P.2d 785] [ordering "refund" after annulment of rate increase].) The above cited legal authorities do assume that "refunds" discussed in the circumstances

there presented will be paid pro rata to ratepayers on the basis of prior overpayments. However, since they themselves in effect *order or require the "distribution"* of the "refunds" therein provided, these authorities are of limited help in answering the commission's argument that, here, it has declined to "order" such "distribution." We therefore seek other aids in ascertaining the legislative purpose.

▮ Where a statute is theoretically capable of more than one construction we choose that which most comports with the intent of the Legislature. (E.g., *Tripp* v. *Swoap* (1976) 17 Cal.3d 671, 679 [131 Cal.Rptr. 789, 552 P.2d 749]; *Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) Words must be construed in context, and statutes must be harmonized, both internally and with each other, to the extent possible. (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224]; *Select Base Materials* v. *Board of Equal., supra,* at p. 645; *Johnstone* v. *Richardson* (1951) 103 Cal.App.2d 41, 46 [229 P.2d 9].) Interpretive constructions which render some words surplusage, defy common sense, or lead to mischief or absurdity, are to be avoided. (*Fields* v. *Eu* (1976) 18 Cal.3d 322, 328 [134 Cal.Rptr. 367, 556 P.2d 729]; *Sanchez* v. *South Hoover Hospital* (1976) 18 Cal.3d 93, 98 [132 Cal.Rptr. 657, 553 P.2d 1129]; *Stanley* v. *Justice Court* (1976) 55 Cal.App.3d 244, 253 [127 Cal.Rptr. 532]; *Watkins* v. *Real Estate Commissioner* (1960) 182 Cal.App.2d 397, 400 [6 Cal.Rptr. 191].) In the present instance both the legislative history of the statute and the wider historical circumstances of its enactment are legitimate and valuable aids in divining the statutory purpose. (*Steilberg* v. *Lackner* (1977) 69 Cal.App.3d 780, 785 [138 Cal.Rptr. 378]; *Alford* v. *Pierno* (1972) 27 Cal.App.3d 682, 688 [104 Cal.Rptr. 110].)

The facts surrounding the enactment of section 453.5 are these: In February 1977, the commission, on its own motion, instituted Case No. 10255. The order instituting investigation (OII) announced that the commission had under scrutiny several matters in which "refunds may be ordered" and was considering withholding any refund from nonresidential customers, since they could presumably pass rate increases on to their own customers. Our records reveal that the *FPC-ordered supplier rebates here at issue were among the sums involved as possible "refunds" in Case No. 10255.* In S.F. 23691, filed October 7, 1977, petitioners in S.F. 23823 sought mandate to compel pro rata refund of the FPC-ordered rebates. We denied relief when the commission argued that the petition was

premature in light of then-pending consideration of the matter in Case No. 10255.

Senate Bill No. 604, which, as amended, became section 453.5, was introduced by Senator Stull (R-Escondido) in March 1977, the month after issuance of the OII in Case No. 10255, and in response to it. (Kuersteiner & Herbach, *supra,* at p. 674.) As originally drafted, the bill provided only that any "refunds" ordered "distributed" by the commission must be allocated on an "equitable pro rata basis," without regard to customer class. The earliest version of the bill contained no definition of "equitable pro rata basis." This definition was supplied in its current form by subsequent amendments which provided that, insofar as feasible, each "current" and "prior" customer must be reimbursed on the basis of "the amount *originally* paid for the *utility service involved,*" or "the amount of *such* service actually received." (Italics added.) A further successful amendment declared that the statute would not prevent refunds to "residential and other small customers" based on current usage.

A sentence was introduced providing that the statute would not preclude the commission from adopting procedures to "amortize refunds" similar to those used for energy cost adjustment clauses (i.e., balancing accounts), but, importantly, this amendment was *deleted* from the final version of the statute. The Legislature declared the new law to be "the positive expression of a continuing legislative intent" with respect to the meaning of section 453 (nondiscriminatory rates) and a "clarification" rather than a "change" of existing law. Section 453.5 was enacted as an urgency measure. (Stats. 1977, ch. 897, §§ 2, 3, p. 2746.)

For several reasons, both the history and language of section 453.5 persuade us that the statutory term "rate refunds," as therein employed, refers to specific amounts held by utilities as rebates from their suppliers and earmarked for customer "refunds" by prior commission orders and utility tariffs.

First, the prior enactment of section 792.5, which mandates *prospective* adjustment of gas cost overcollections under balancing account procedures, plus the Legislature's specific *omission* from section 453.5 of

language which would have permitted such balancing account treatment of "rate refunds," suggests that "refunds" were considered by the Legislature to be conceptually separate from other forms of overcollection.

The commission argues that the deleted "balancing account" language was simply deemed superfluous, because the commission already has authority to employ balancing accounts. We disagree. As we have seen, balancing procedures, which operate in futuro, inherently contradict the formula for retrospective reimbursement provided by section 453.5. This conflict was obviously resolved against the commission's view by the legislative excision. (*Madrid* v. *Justice Court* (1975) 52 Cal.App.3d 819, 825 [125 Cal.Rptr. 348]; *Rich* v. *State Board of Optometry* (1965) 235 Cal.App.2d 591, 607 [45 Cal.Rptr. 512].)

Second, section 453.5 was introduced to avert what its sponsor viewed as discriminatory treatment of the very rebates here at issue, and was thereafter enacted on an urgency basis as a "clarification" of existing law. Thus, there is strong evidence that the Legislature acted with specific reference to these rebates and viewed them as included within the separate, limited category of "rate refunds." (See Kuersteiner & Herbach, *supra,* at p. 674.)

The commission's attempt to diminish the significance of the "clarification" language is not persuasive. Citing an offset case in which, prior to enactment of section 453.5, balancing account procedures were used (*San Diego Gas & Electric Co.* (July 19, 1977) Dec. No. 87639), the commission contends that the Legislature, by deeming section 453.5 a "clarification" of current law, simply intended to approve such practices. The *San Diego* case is inapposite, however, because no supplier rebates were there involved. Moreover, the timing of Senate Bill No. 604, and its deliberate omission of balancing account authority for "rate refunds," more reasonably suggest that the Legislature intended to limit, not affirm, commission discretion.

Third, though the commission argues that it may supersede tariffs at will, the term "rate refunds," as used in the statute, appears logically referable to similarly worded provisions in the 1972-1976 tariffs to the effect that the instant supplier rebates, if received, would be "refund[ed]" to customers of the utilities. It seems reasonable to assume that, in

enacting section 453.5, the Legislature sought to prevent the commission from denying these promised "refunds" to particular classes of customers.

Fourth, supplier rebates subject to "refund," on the one hand, and balancing account overcollections, on the other, may be logically distinguished on another ground relevant to section 453.5. The typical balancing account reflects excessive charges for the period *immediately preceding* rate adjustment. (See § 792.5; cf., *Southern Cal. Edison Co.* v. *Public Utilities Com., supra,* 20 Cal.3d 813, 823.) Because the period of time between overcharge and rate relief is thus relatively small, such a rate adjustment, though it allocates benefits on the basis of current rather than past use of utility service, is nonetheless a fairly accurate means of doing equity to customers previously overcharged.

In contrast, supplier rebates are generally time-delayed; the sums at issue here represent overcharges occurring as far back as late 1972 or early 1973. Because, as the instant petitions demonstrate, the circumstances and identification of the customers who paid these charges may have changed radically in the intervening period, prospective relief, occurring through balancing account procedures, gives little assurance of equitable allocation. These considerations reinforce our view that the direct pro rata reimbursement formula of section 453.5 was intended to apply to the instant circumstances.

Fifth, and most fundamentally, acceptance of the premise that section 453.5 applies only when the commission chooses to call its actions "refunds" would permit the commission, by a simple *ipse dixit,* to avoid the statute in every case. That is a capricious and absurd result, and would render section 453.5 entirely superfluous. We must assume the Legislature had no such intent, but desired, instead, as fair and equitable a result as could be reached.

We are aware that the Governor, acting on commission recommendation, advised the Senate that he had signed Senate Bill No. 604 "on an opinion of the . . . Commission's legal staff" that section 453.5 would not preclude the commission from "amortizing potential refunds in balancing accounts . . . ." (See Commission Investigation, Case No. 10255 (Mar. 15, 1977) Dec. No. 89106, pp. 15-16.) ■ To the extent that the Governor's disclaimer is inconsistent with the Legislature's clear purpose, however, we regard it as ineffective. As to nonappropriation measures, the California Constitution permits the Governor either to accept or

reject a bill in its entirety. (Cal. Const., art. IV, § 10.) From this it follows that, as we have said, he may not by qualifying his approval exercise what is in effect an "item veto." (*Lukens* v. *Nye* (1909) 156 Cal. 498, 503 [105 P. 593].)

Nor can we conclude that application of the rebates to future rate relief is justified on grounds that direct refunds to industrial ratepayers would constitute a windfall recovery of costs which were presumably passed on to such ratepayers' customers. Such a conclusion that the prior over-charges were passed on is inherently conjectural. In any event, the specific language and legislative history of section 453.5 suggest strongly that its provisions were intended to prevent just such discrimination against nonresidential gas users.

■ Within the context of the case before us, we therefore hold that the statutory term "rate refunds," as used in section 453.5, refers to prior direct rebates received by utilities from their suppliers for past over-charges, and earmarked by commission-approved tariffs for "refund" to customers. We further conclude that the commission "orders" such "refunds" to be "distributed" whenever it directs their final disposition, thereby dividing and apportioning them. (See definition of "distribute," Webster's New Internat. Dict., *supra,* at p. 660.) The construction of section 453.5 we thus adopt is reasonably inferable from the statutory language, does not impair the implementation of section 792.5, and most nearly respects the apparent statutory purpose as reflected in the public and legislative history of section 453.5.

■ From the foregoing, it follows that the commission exceeded its powers when it "distributed" the supplier rebates here at issue to the PG&E and SoCal balancing accounts as an offset to prospective rate increases, rather than adhering to the "refund" rules described in section 453.5. No other aspects of Decisions Nos. 88261 and 88751 are before us for review. The two decisions must therefore be annulled *to the extent* that they purport to dispose of the supplier rebates in violation of the statute.

We are mindful of section 453.5's admonition that the obligation to provide pro rata refunds based on past usage is limited by considerations of practicality. Therefore, we do not foreclose the commission from formulating a plan for matching refunds with the present and prior customers entitled thereto. The *general* feasibility of reimbursing many

such customers in strict accordance with their actual overpayments is demonstrated by past refund plans approved by the commission. (See, e.g., PG&E Gas Refund Plan No. 11 (Apr. 11, 1975) pp. 2-3, approved by Res. No. G-1734 (Apr. 29, 1975); SoCal "Proposed Plan for July 1975 Refund" (June 12, 1975) pp. 9-12, approved by Res. No. G-1772 (June 24, 1975).) The statute expressly provides that those "small residential customers," as to whom records of prior use may be difficult to retrieve, may be reimbursed on the basis of current usage. (§ 453.5, *supra.*)

Appropriate interest should, of course, be allowed on all refunded amounts, and suitable accounting adjustments made to reflect the changed disposition of the supplier rebates.

Our disposition of these cases makes it unnecessary for us to reach petitioners' additional arguments.

Decisions Nos. 88261 and 88751 are annulled insofar as they dispose of FPC-ordered supplier rebates held by PG&E and SoCal, respectively, other than as "rate refunds" to be "distributed" pursuant to section 453.5, and both matters are remanded to the commission for further proceedings consistent with our opinion. Petitioners shall recover their costs from the commission; real parties shall bear their own costs. (See rule 26(a), Cal. Rules of Court.)

Bird, C. J., Mosk, J., Clark, J., Manuel, J., and Regan, J.,* concurred.

NEWMAN, J.—I dissent. I have not been persuaded by either written or oral argument (1) that "section 453.5 was intended to apply to the instant circumstances" (maj. opn., *ante,* at p. 847), or (2) that the section superseded other pertinent statutes.

I regret that, because of the court's overload and ongoing proceedings of the Commission on Judicial Performance, I am not able to allot the hours that would be required to prepare an appropriate dissenting opinion. (Cf. opn. of Sawyer, J., dissenting, in *People* v. *Campbell* (1866) 30 Cal. 312, 316.)

---

*Assigned by the Chairperson of the Judicial Council.