[No. S044844. Dec. 18, 1995.]

ASSEMBLY OF THE STATE OF CALIFORNIA et al., Petitioners, v.
PUBLIC UTILITIES COMMISSION, Respondent;
PACIFIC TELESIS, Real Party in Interest.

88

**COUNSEL**

Remcho, Johansen & Purcell, Joseph Remcho, Robin B. Johansen, John A. Lewis and Philip C. Monrad for Petitioners.

Peter Arth, Jr., Anne K. Mester, William N. Foley, Frederick N. Harris and Joel Perlstein for Respondent.

No appearance for Real Party in Interest.

OPINION

GEORGE, J.—In this case, we must determine the validity of an order, issued by the California Public Utilities Commission (Commission) in January 1995, directing the disposition of funds (then exceeding $50 million) that had been deposited by Pacific Telesis into a designated account pursuant to a November 1993 order of the Commission. In the latter decision, the Commission found that Pacific Bell, a subsidiary of Pacific Telesis, improperly failed to refund to its customers $7.9 million ordered refunded a decade earlier. As a consequence of Pacific Bell's wrongful withholding of the refund, the Commission ordered Pacific Telesis to pay, into a designated account, $7.9 million plus interest *at the rate of 18 percent per year*, compounded monthly, from September 1, 1983, through the date of payment into the account. The November 1993 decision of the Commission, however, did not order that the funds that were to be deposited by Pacific Telesis be distributed directly to Pacific Bell's customers. Instead, the Commission reserved judgment on that question, indicating that, because the current Pacific Bell ratepayers were not necessarily those who had paid the rates upon which the refund was based, the Commission, as a matter of "equity," "may prefer to disburse this refund in a manner which will more broadly benefit Californians."

Shortly after the November 1993 order was issued, Pacific Telesis complied with the order and deposited into a designated account (the Pacific Telesis account) the sum of approximately $50 million ($7.9 million principal, plus $42.1 million interest).

Thereafter, the Commission held hearings on the appropriate disposition of the money in the Pacific Telesis account. After initially adopting one disposition in August 1994, the Commission, in response to several rehearing petitions, modified that approach in January 1995 and entered the order that is challenged in the present proceeding. In its January 1995 decision, the Commission ordered disbursement of the sum of approximately $11.6 million to the current customers of Pacific Bell (the refund principal of $7.9 million, plus interest on that amount calculated *at a rate of 3.4 percent per year*, compounded monthly, from September 1, 1983 [approximately $3.7 million in interest]). With regard to the balance of the Pacific Telesis account (which at the time amounted to more than $42 million), the Commission ordered that such funds be "allocated toward school telecommunications infrastructure development and consumer education."

The petition for writ of review filed in this court in the present proceeding,[1] challenging the validity of the Commission's January 1995 order, maintains that the Commission violated section 453.5 of the Public Utilities Code[2] in failing to order a refund of the entire amount of the Pacific Telesis refund account to Pacific Bell customers. The petition further asserts that, in diverting a portion of these funds for a different, public use of its own choosing, the Commission improperly invaded the legislative domain of taxation and appropriation.

As we shall explain, we conclude that the Commission's January 1995 order violates section 453.5 and therefore should be set aside.

### BACKGROUND

In February 1993, the Commission instituted an investigation of a proposal by Pacific Telesis to "spin off" a number of its "wireless subsidiaries" (including PacTel Cellular, PacTel Paging, and Pacific Telesis International) into a separate corporation, to be known as PacTel Corporation. In the course of its investigation of the proposed spinoff (and the conditions, if any, that should be imposed upon its approval of the proposal), the Commission determined that the Pacific Bell ratepayers were entitled to a monetary reimbursement from Pacific Telesis (Pacific Bell's parent corporation), because the utility improperly had retained funds that should have been refunded to its ratepayers under a 1982 order of the Federal Communications Commission (FCC).

As the Commission explained in its November 1993 decision, in approving a proposal of American Telephone and Telegraph (AT&T) to capitalize a cellular subsidiary (AT&T Cellular), the FCC in 1982 had ordered AT&T to reimburse all of the Bell Operating Companies (including Pacific Bell) for certain cellular research and development expenses, explicitly directing that all expenses incurred prior to June 30, 1982, "must be reimbursed to ratepayers" who had absorbed these costs through the rates they had been charged. In September 1983, pursuant to the FCC order, AT&T paid to Pacific Bell a reimbursement of $7.9 million. Instead of refunding this amount to its ratepayers (as the FCC had directed), however, Pacific Bell unilaterally determined that the refund was not one that it was required to "pass through" to its ratepayers, and, in the words of the Commission, improperly "pocketed" the refund.

In its November 1993 decision, the Commission specifically found "that the reimbursed funds were intended by both the FCC and this Commission to

---

[1] Petitioners are the Assembly of the State of California and Willie L. Brown, Jr., then Speaker of the Assembly and a ratepayer of Pacific Bell.

[2] All further statutory references are to the Public Utilities Code unless otherwise indicated.

be refunded to PacBell ratepayers and were not so refunded." As a consequence, the Commission concluded that its approval of the Pacific Telesis spinoff proposal should be conditioned, among other matters, upon a requirement that Pacific Telesis "pay to PacBell all principal payments with compound interest no later than 30 days after the date of this decision."

With regard to the rate of interest to be assessed on the unpaid refund, the Commission observed that conventionally the Commission had designated "the short term commercial paper rate" as the rate of interest that it charged on refunds that had been owing to ratepayers over a period of time. The Commission concluded, however, that a higher interest rate was appropriate in the present case, because Pacific Bell had disregarded the FCC order and, instead of refunding to its ratepayers the reimbursement moneys received from AT&T, had retained them, allowing the company the use of the moneys in the intervening years. The Commission concluded that, under the circumstances, an appropriate rate of interest would be the rate that Pacific Bell had charged its customers with delinquent accounts for late payments during this same period—18 percent per annum (1.5 percent per month), compounded monthly. The Commission further noted that Pacific Bell's return on its equity investment fluctuated between 13 percent and 16 percent, and that an interest rate representing 2 to 5 percentage points above its return on such investment was reasonable. Accordingly, the Commission ordered that interest accrue at the rate of 18 percent, from September 1, 1983 (the date Pacific Bell received the $7.9 million from AT&T) until payment was made by Pacific Telesis to Pacific Bell. It was further ordered that, once deposited by Pacific Telesis in an interest-bearing account, the funds accrue interest at the lower, short-term commercial paper rate.

The Commission declined to order immediate distribution of the refund to Pacific Bell's customers, however, explaining: "[W]e hesitate to order the refund directly through to ratepayers at this time. We find that there is a question of equity, as the ratepayers who paid the research may not be those receiving the funds. As we cannot be sure that those who paid the expense will receive the benefit, we may prefer to disburse this refund in a manner which will more broadly benefit Californians." The Commission determined to schedule evidentiary hearings on the disbursement of the funds.[3]

Pursuant to the order of the Commission, Pacific Telesis deposited into a designated account a total sum, including the refund principal and interest, of approximately $50 million.

---

[3]The Commission explained: "There are a number of methods of distribution which bear exploring, for example, setting aside a fund for advanced telecommunications for schools and libraries, or for rural or economically underdeveloped zones. Other options might be to reinstate a telecommunications education trust, or to create a fund to promote the achievement of universal service goals. In the last analysis, the most equitable treatment may be to flow the refund through to the ratepayers in a Z factor adjustment. We will pursue these different

On January 28, 1994, the Commission initiated the second phase of its proceedings relating to the disbursement of the Pacific Telesis account. In the course of these proceedings, numerous interested parties, including the Division of Ratepayer Advocates of the California Public Utilities Commission (DRA), Toward Utilities Rates Normalization (TURN), and the Mexican-American Political Association and Latino Issues Forum, were requested to comment upon the criteria that should govern the foregoing distribution and, in particular, upon whether the $50 million should be refunded directly to ratepayers or employed for some other purpose.

On August 3, 1994, the Commission issued its order (Cal. Dec. No. 94-08-030) directing the disposition of the funds deposited in the Pacific Telesis account. The Commission explained the factors and criteria that had guided its decisionmaking process, noting that the DRA and several other associations had expressed the view that, because the moneys constituted a rate refund originally ordered by the FCC, section 453.5 required the Commission to refund directly to the ratepayers the entire $50 million, and that the Commission lacked the discretion to employ any portion of the refund for distribution to other parties or institutions. DRA acknowledged that the time period for which the refunds were ordered (the years 1974-1982) was sufficiently remote to preclude identification of the prior ratepayers who had been charged the inflated rates, and therefore proposed a one-time credit for current customers.

Other parties expressed the view that, because a small, one-time refund to current ratepayers would provide little benefit to the public, and the ratepayers who actually had funded cellular development through inflated rates more than ten years earlier would not necessarily receive the benefit of the refund, the Commission should employ the funds for a purpose that would provide a greater benefit to the class harmed (the 1974-1982 Pacific Bell ratepayers) than would a direct refund to current ratepayers.

Several parties recommended, as an alternative to a direct refund, that the moneys be employed for the development of telecommunications infrastructure in California's schools and libraries, as proposed by the Governor,[4] in light of the severe underfunding of California's schools and the increasing importance of telecommunications technology in education. Many parties, however, opposed this suggestion, arguing that such use of the fund would

---

theories of compensation in further evidentiary hearings, set by the [administrative law judge] at a future date."

[4]The record indicates that in a January 21, 1994, letter to the Commission, Governor Wilson suggested that $45 million from the "Pacific Telesis spin-off case," i.e., the Pacific Telesis account, be directed to telecommunications infrastructure for schools and libraries, consistent with the recommendation of a 1993 report of the Commission.

amount to a tax imposed upon ratepayers for the payment of public expenses unrelated to the regulation of public utilities, and that the Commission had neither the authority nor the duty to employ the ratepayer refund for such a purpose.

In a decision rendered by a majority of its members, the Commission acknowledged that "[r]efunding the money directly to current ratepayers is the option most clearly supported by California law and the practices of the Commission." The Commission addressed the argument of certain interested parties that the equitable doctrine of *cy près* would support the use of the refund monies to benefit telecommunications customers generally. Responding to this argument, the Commission noted "the doctrine of cy pres has not been recognized by the Commission in proceedings involving refunds to ratepayers *because the Commission is governed by [section] 453.5 which requires that whenever the Commission orders rate refunds to be distributed, the Commission shall require public utilities to pay refunds to all current customers, and all prior customers when practical.*" (Italics added.) The Commission further observed that the designation of a ratepayer refund for infrastructure improvements for schools and libraries would be inconsistent with the Commission's long-standing rate-fixing policy disallowing charges for such purposes.

The Commission nevertheless determined that, because "current ratepayers are unlikely to be those who originally paid the monies now under consideration," the Commission had "greater discretion" in this particular case with regard to the use of the ratepayer refund, and thus was empowered to divert the interest accrued thereon to purposes other than distribution to ratepayers. The Commission concluded that funding telecommunications infrastructure for schools was an "appropriate" use of the interest, because schools uniquely were positioned to facilitate public access to the "information superhighway," an action that would benefit directly all California telecommunications users.

Accordingly, in its August 1994 decision, the Commission, by a three-member majority, directed disbursement of the Pacific Telesis account as follows: $7.9 million to be refunded directly to current ratepayers, $40.3 million to be allocated for telecommunications infrastructure development in public schools "as directed by Governor Wilson," and the balance of the fund, in the approximate amount of $2.1 million, to be allocated to the Telecommunications Education Trust, an entity previously established by the

Commission to promote consumer education.[5] The Commission delegated to the Governor the ultimate authority to determine the specific uses of the nonrefunded moneys.

Commissioners Patricia M. Eckert and Norman D. Shumway dissented from the decision of the majority. In her dissenting opinion, Commissioner Eckert stated it was clear that "the $50.3 million must all be refunded to Pacific Bell's ratepayers under California law," citing section 453.5 and *California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 847 [157 Cal.Rptr. 676, 598 P.2d 836], a decision holding the Commission may not, in order to evade the provisions of section 453.5, declare that a fund previously ordered distributed to ratepayers is not a "refund." This dissenting opinion concluded that "[t]he Commission simply does not have the discretion under this code section to allocate refunds in the manner set forth in this decision, however worthy the cause."

On September 7, 1994, petitioners sought rehearing before the Commission of its Decision No. 94-08-030, arguing that its proposal for disbursement violated section 453.5 and usurped the taxing, appropriation, and legislative authority of the Legislature. On January 5, 1995, the Commission denied rehearing but modified its decision in a number of significant respects.

First, the Commission determined that, in addition to refund of the principal in the amount of $7.9 million, "an appropriate level of interest" on the refund should be paid to the ratepayers, citing this court's decision in *California Mfrs. Assn.* v. *Public Utilities Com.*, *supra*, 24 Cal.3d 842, 849, holding that "appropriate interest" should be allowed on all amounts refunded to ratepayers pursuant to section 453.5.

Second, the Commission concluded that, although it had determined that Pacific Bell's customers were entitled to receive "appropriate interest" on the $7.9 million principal, the 18 percent interest charged to Pacific Telesis was *not* the appropriate rate of interest to which the ratepayers were entitled on their refunds in this case. The Commission explained its reasoning as follows: "In [our November 1993 decision], we determined that a high interest rate was appropriate because of Pacific's failure to comply with the

[5]In 1988, following the determination of the Commission that Pacific Bell had engaged in marketing abuses in violation of section 532 and of various Commission rules and orders, the Commission ordered, as a penalty against Pacific Bell, that the utility fund a ratepayer education program—the Telecommunications Education Trust (TET)—aimed at ensuring that Pacific Bell not engage again in objectionable marketing devices. (*Re Pacific Bell* (1987) 27 Cal.P.U.C.2d 1; *Re Pacific Bell* (1988) 29 Cal.P.U.C.2d 486.) The activities of TET were to expire in or about 1994.

FCC order and refund the cellular research and development expenses to ratepayers long ago. The 18% annual interest rate adopted in [that decision] reflects our displeasure with Pacific's failure to pass the AT&T refund on to ratepayers. [¶] There is a difference between what we found to be an appropriate interest rate to charge Telesis and what we find to be the appropriate interest rate to apply to the $7.9 million principal to be refunded to ratepayers, however. As [the November 1993 decision] notes, '[i]t has been a convention of the Commission to assign the short term commercial paper rate as interest in the case of refunds owing to ratepayers over a period of time.' [Citation.] We will use this convention in the current proceeding." Finally, the Commission stated that it believed a refund of the $7.9 million principal with 3.4 percent interest fully comported with the requirements of section 453.5 as construed by our decision in *California Mfrs. Assn.*, and that it did not believe section 453.5 required a refund to ratepayers of the entirety of the interest that Pacific Telesis had been required to pay pursuant to the Commission's earlier order.

In its three-member majority decision, the Commission accordingly ordered that the amount of $7.9 million with 3.4 percent interest accrued thereon, compounded monthly from September 1, 1983, through the date of disbursement, be paid to the ratepayers.

The Commission further ordered that the balance of the Pacific Telesis account (an amount in excess of $42 million) be allocated for telecommunications infrastructure development and consumer education as previously designated in its August 1994 decision. The Commission additionally modified its prior decision by deleting its delegation of authority to the Governor regarding the ultimate use of the nonrefunded moneys.

In his dissenting opinion, Commissioner Shumway maintained that the majority decision violated section 453.5 because "the entire fund is derived from a refund owed ratepayers," and "[t]o separate part of the interest and consider it something other than a refund so that it may be assigned to purposes other than payments to ratepayers subverts PU Code § 453.5."

On February 10, 1995, petitioners timely filed in this court a petition for writ of review of the Commission's decision determining the distribution of the Pacific Telesis refund account. (§ 1756.) The petition alleged that (1) in failing to order the entirety of the 18 percent interest amount paid by Pacific Telesis to be distributed to the ratepayers, the Commission violated section 453.5 and exceeded its constitutional and statutory authority, and (2) the Commission's actions constituted a usurpation of the legislative power to tax

and spend, and an unlawful attempt to establish the Commission's own treasury and "arrogate to itself the core legislative function of how to apportion scarce public resources between competing urgent demands on the public fisc." Petitioners argued that the difference between the 18 percent interest charged Pacific Telesis and the 3.4 percent interest accorded to the ratepayers must be (1) distributed to the ratepayers pursuant to section 453.5, *or* (2) treated as a penalty and paid into the State Treasury General Fund as required by various provisions of the Public Utilities Code, *or* (3) escheated to the General Fund to the extent unclaimed by rateholders.

In its answer to the petition, the Commission maintains that it has discretion to determine the appropriate interest rate to which the ratepayers are entitled on their refund, and that—in ordering refund of the principal with an appropriate rate of interest—the Commission has complied with section 453.5 and our decision in *California Mfrs. Assn.* According to its answer, although the Commission originally established an interest rate of 18 percent, it was entitled "to refine its thinking between one decision and the next" and to determine that a different interest rate should be applied with respect to the calculation of interest to be refunded to the ratepayers. The Commission accordingly maintained that the interest differential did not constitute part of the ratepayer refund. The Commission also relied upon the establishment of TET pursuant to a prior Commission decision (see fn. 4, *ante*), as providing precedent for the Commission's present actions.

On May 23, 1995, we granted the petition for review.[6]

---

[6]Following issuance of the writ and the completion of briefing, petitioners were granted leave to file a supplemental brief accompanied by a request that the court take judicial notice of designated materials, including Assembly Bill No. 1302, 1995-1996 Regular Session, introduced in the California Assembly on February 23, 1995 (and subsequently passed by the Legislature and approved by the Governor on October 11, 1995, as noted below). This legislation provides for the appropriation of moneys from the Pacific Telesis account to be used for purposes of telecommunications development in public schools, consistent with the decisions of the Commission that are the subject of the present writ proceeding, and labels the appropriation as the imposition of a tax. The bill further provides that this provision "shall not become operative until the California Supreme Court issues its decision in Assembly of the State of California v. Public Utilities Commission, No. S044844, or the court's stay in that matter is otherwise lifted." (Stats. 1995, ch. 767, § 18(b).)

Subsequently, the Commission requested this court to take judicial notice of (1) the enactment of Assembly Bill No. 1302, passed by the Legislature and signed into law by the Governor on October 11, 1995 (Stats. 1995, ch. 767) (operative only upon enactment of a pending companion bill (*id.*, § 20)), (2) the companion bill, Assembly Bill No. 1519, 1995-1996 Regular Session, also relating to the Pacific Telesis account that is currently pending in the Legislature, and (3) a decision of the Commission, dated November 8, 1995, ordering the reopening of proceedings relating to the disbursement of the Pacific Telesis

## DISCUSSION

In analyzing the legal question presented by this case, it is important to recognize at the outset that the issue before us is specific and narrow. First, we have no occasion in this proceeding to pass upon the validity of the Commission's November 1993 order, directing Pacific Telesis to deposit into a designated account the $7.9 million refund principal that Pacific Bell improperly failed to pass on to its ratepayers, together with the 18 percent interest on that principal. Pacific Telesis did not challenge that order and, accordingly, its validity is not before us.

Second, we emphasize that we are not faced with the issue of the soundness or wisdom, as a matter of public policy, of the Commission's proposed disposition of the funds in question. Official pronouncements by both the legislative and executive branches of state government repeatedly and emphatically have stressed the importance of furthering the development of an advanced telecommunications infrastructure in California and the vital nature of the role of our state's educational system in this endeavor.[7] Thus, as a matter of policy, the Commission's proposed disposition might well reflect a wise use of such funds. The issue before us, however, is the legality,

---

account, operative only in the event this court lifts the stay of the proceedings in effect by virtue of the present writ proceeding.

Pursuant to Evidence Code sections 451 and 452, we take judicial notice of the matters designated by petitioners and the Commission. The propriety of a *legislative* appropriation of funds from the Pacific Telesis account for a use other than a direct refund to the customers of Pacific Bell, however, is not the subject of this writ proceeding, which solely involves review of the *Commission's* authority to direct the disposition of the Pacific Telesis account as set forth in the challenged decisions, which preceded the recent legislation. The question of the constitutionality of the recent legislative action is not properly before us and has not been briefed, and we therefore have no occasion to decide the validity of the proposed legislative appropriation of funds from the Pacific Telesis account.

[7]In 1993, the Commission produced a report entitled, A Strategy for Telecommunications Infrastructure, recommending significant investment in the development of telecommunications infrastructure throughout California's schools and libraries—an infrastructure that, according to the report, lagged far behind that of businesses and many consumers with respect to access to technology. Also in 1993, the Legislature enacted section 882 (Stats. 1993, ch. 1274, § 3), providing in part: "(a) The Public Utilities Commission shall, as soon as practicable, open a proceeding or proceedings to, or as a part of existing proceedings shall, consider ways to ensure that advanced telecommunications services are made available as ubiquitously and economically as possible, in a timely fashion, to California's citizens, institutions, and businesses. The proceeding or proceedings should be completed within one year of commencement. [¶] (b) The proceeding or proceedings shall develop rules, procedures, orders, or strategies, or all of these, that seek to achieve the following goals: [¶] (1) To provide all citizens and businesses with access to the widest possible array of advanced communications services. [¶] (2) To provide the state's educational and health care institutions with access to advanced communications services. [¶] (3) To ensure cost-effective

rather than the wisdom, of the Commission's decision under the circumstances of the present case. ■■■ The question presented is simply whether the Commission, *having obtained the funds that are deposited in the Pacific Telesis account by virtue of the November 1993 order described above*, lawfully could order that such funds be disposed of in the manner prescribed by its January 1995 order. It is only this narrow issue that is presented here.

The basis of the Commission's November 1993 order, requiring Pacific Telesis to deposit into an account the sum of approximately $50 million, was the utility's obligation to refund moneys to ratepayers pursuant to the prior 1982 order of the FCC. The amount of the refund ordered by the Commission was calculated based upon the refund principal ($7.9 million) plus interest on the principal. The inclusion of interest, in calculating the total amount of a rate refund in this setting, expressly was approved in *California Mfrs. Assn.* v. *Public Utilities Com.*, *supra*, 24 Cal.3d 842,[8] which held that the Commission, when ordering a rate refund under section 453.5, shall include "[a]ppropriate interest" on all refunded amounts. (24 Cal.3d at p. 849.) In an analogous context, the Legislature has recognized that it is appropriate for the Commission to pay interest on rate refunds distributed to ratepayers. (§ 1766.)[9]

Thus, the funds deposited by Pacific Telesis constituted the refund principal, plus interest on the principal. As discussed *post*, as an alternative to charging the high interest rate of 18 percent on the refund principal, the Commission might have sought to impose a *penalty* against Pacific Telesis or Pacific Bell—separate from the rate refund—because of their disregard of the FCC order. The Commission chose not to proceed in that fashion, however. Instead, the Commission elected to obtain from Pacific Telesis approximately $40.3 million as *interest* under its authority, recognized in *California Mfrs. Assn.*, to collect interest on the refund principal, such interest constituting part of the total refund.

---

deployment of technology so as to protect ratepayers' interests and the affordability of telecommunications services. . . ."

Additionally, the Legislature enacted section 2884.3, which provided in part that "[t]he commission shall establish a task force on telecommunications network infrastructure. . . ." (Stats. 1993, ch. 1281, § 2.)

[8]In *California Mfrs. Assn.* v. *Public Utilities Com.*, *supra*, 24 Cal.3d 842, 845, the court concluded that both the history and the language of section 453.5 indicate that the term "rate refund[]," as used in that section, refers to "specific amounts held by utilities as rebates from their suppliers and earmarked for customer 'refunds' by prior commission orders and utility tariffs." In so construing the term "rate refund[]," however, the court clearly did not exclude from the operation of section 453.5 other types of refund monies that constitute rate refunds.

[9]Under section 1766, in the event this court upholds a Commission order lowering a utility rate that has been challenged, "all money which the public utility has collected pending the appeal in excess of that authorized by the order or decision of the commission, together with *such interest as may be reasonable*, shall be promptly paid to the corporations or persons entitled thereto . . . ." (Italics added.)

Because the funds were deposited by Pacific Telesis pursuant to the utility's existing obligation to distribute a rate refund to Pacific Bell's customers, the disbursement of the funds by the Commission is governed by section 453.5. That statute provides: "Whenever the commission orders rate refunds to be distributed, the commission shall require public utilities to pay refunds to all current utility customers, and, when practicable, to prior customers, on an equitable pro rata basis without regard as to whether or not the customer is classifiable as a residential or commercial tenant, landlord, homeowner, business, industrial, educational, governmental, nonprofit, agricultural, or any other type of entity. [¶] For the purposes of this section, 'equitable pro rata basis' shall mean in proportion to the amount originally paid for the service involved, or in proportion to the amount of such utility service actually received. [¶] Nothing in this section shall prevent the commission from authorizing refunds to residential and other small customers to be based on current usage."

■ The legislative history of section 453.5 reflects that a purpose of the enactment was to restrict the Commission's discretion with respect to the use of ratepayer refunds ordered by the Commission. The legislative measure was introduced in the 1975-1976 Regular Session of the Legislature as Senate Bill No. 604, clarifying existing law governing rate refunds (the law not then expressly requiring that such refunds be distributed to all utility customers on an equitable pro rata basis [see § 453] ). The apparent legislative objective was to preclude a refund procedure favoring one class of customers over another, and to prevent the Commission from employing such funds for a purpose entirely apart from a refund to utility customers. (Assem. Office of Research, 3d reading analysis of Sen. Bill No. 604 (1975-1976 Reg. Sess.) as amended Aug. 25, 1977.) The legislative history of the bill reflects that those parties who opposed the proposed legislation did so on the basis that "[t]he PUC should be allowed to make the determination of how the refunds should be paid and to whom." (Sen. Com. on Pub. Util., Transit, and Energy, Analysis of Sen. Bill. No. 604 (1975-1976 Reg. Sess.) as amended May 18, 1977.) A committee bill analysis noted that "[t]he Department of Consumer Affairs opposes this bill *because it restricts the manner in which the PUC may authorize the distribution of refunds*. The department also believes that refunds that would normally go to industrial and commercial customers should be put into a conservation trust fund to be used for energy conservation demonstration projects." (Sen. Com. on Fin., Ins., and Com., Analysis of Sen. Bill No. 604 (1975-1976 Reg. Sess.), italics added.) In response to these views, the analysis observed that a purpose of the bill was in fact to limit the Commission's ability to employ the rate refunds for such purposes, in that "[w]hile the conservation of energy may be a laudable goal, the concept would raise a multitude of administrative

problems and in all likelihood this approach would constitute confiscation of property or illegal taxation." (*Ibid.*)

The Commission initially argues to us that its actions are consistent with section 453.5, because that statute itself recognizes that it is appropriate for the Commission to attempt to allocate rate refunds on an equitable basis that, to the extent feasible, benefits the class of customers who in the past actually paid the overcharges to which the refund corresponds. (See *California Mfrs. Assn.* v. *Public Utilities Com., supra,* 24 Cal.3d 836, 847-848.) The Commission notes that in its November 1993 decision, ordering the deposit of funds by Pacific Telesis, the Commission expressed concern over the mismatch between those who paid the inflated rates (to whom the refunds should have been paid in 1983) and the present customers of Pacific Bell.

By its 1995 disbursement order, however, the Commission did not purport to apportion the $7.9 million refund principal between current and prior customers, as authorized by section 453.5, but rather ordered the entire principal refunded to current customers. Acknowledging that it would be impractical to attempt to identify the pre-1982 ratepayers or to quantify the amount of the rate refund to which they would be entitled, the Commission directed that the entirety of the $7.9 million principal be paid to Pacific Bell's current customers. Nothing in section 453.5 suggests that, once having ordered the distribution of a rate refund to a utility's current customers, the Commission may refuse to refund to those customers (who are paid the refund principal) the interest that the Commission has assessed against the utility on the basis of the refund principal. The interest charged on the ratepayer refund constitutes part of the refund. Thus, section 453.5 does not authorize the Commission—in ordering that the entirety of the principal be paid to the ratepayers—to order that only a portion of the interest paid by the utility be refunded to the ratepayers, and to allocate the remaining interest for a completely different purpose. The legislative history of the statute instead reflects a legislative intent to preclude such discretionary disposition of rate refunds by the Commission.

Nor does section 453.5, or any other statutory provision, authorize the Commission to utilize one interest rate in computing the amount of interest that a utility is required to pay on rate overcharges to be refunded to its customers, and a different interest rate in determining the amount that the utility customers are entitled to receive on the refund principal distributed to them.

For these reasons, even if the interest rate of 3.4 percent could be justified in the abstract as an "appropriate" rate of interest, we believe that in the

present case the Commission is not entitled to order a refund of less than the full 18 percent interest that it has obtained from Pacific Telesis.

In this regard, the Commission's proposed interpretation of section 453.5 creates the potential not only for unfairness to ratepayers but also for the imposition of inequitable, inappropriate burdens upon utilities. If the Commission were authorized to impose one rate of interest against a utility in determining the amount that the utility is required to pay pursuant to a refund order, and then to order that a lower rate of interest apply to the amount refunded to ratepayers, there would be a significant risk that the Commission would impose a high rate of interest simply to obtain funds that thereafter could be employed to pay for projects that the Commission believes are in the public interest. The Commission does have the authority to seek penalties against a utility for misconduct, but the statutes applicable to penalties contain various procedural protections for the utility and also direct that amounts paid as penalties should be deposited into the General Fund. (See fn. 10, *post.*)

The Commission additionally maintains that the funds obtained from Pacific Telesis representing the difference between 3.4 percent and 18 percent interest properly should not be considered interest on the refund that must be distributed to ratepayers under section 453.5. Although the Commission acknowledges that its November 1993 order characterized and justified the charge as interest, it argues that it was entitled to "refine its thinking" (between the November 1993 and January 1995 decisions) as to the appropriate rate of interest, and to treat the differential as something other than interest. The reasoning of the Commission's January 1995 decision ("[t]he 18 percent interest . . . reflects our displeasure with Pacific's failure to pass the AT & T refund on to ratepayers") suggests that this sum plausibly might be characterized as a penalty. The Commission insists, however, that the nonrefunded portion of the funds is not a penalty but, "in essence, an equitable fund which can be used to advance the State policy of improving telecommunications consumer education and school telecommunications infrastructure."

In our view, this argument has no merit. As explained previously, under applicable statutes the Commission might have been authorized to proceed against Pacific Telesis by (1) requiring a refund to ratepayers of $7.9 million plus 3.4 percent interest, and (2) pursuing a separate proceeding against Pacific Telesis in which the Commission might have sought to impose a punitive fine against the utility for wrongfully failing to comply with the 1982 FCC order and unilaterally retaining the funds in question. Existing statutory provisions authorize such a penalty proceeding, but require that any

penalty be deposited in the General Fund.[10] The Commission did not proceed in that fashion, however, but instead obtained the funds from Pacific Telesis as *interest* on the $7.9 million principal. Under these circumstances, we do not believe the Commission may seek thereafter to characterize the funds as something other than interest, in order to justify its decision not to order the money refunded to customers.

■ The Commission finally relies upon section 701 as conferring an "open-ended grant of authority to the Commission" with respect to the use of funds such as the 14.6 percent interest differential. To the contrary, that statute does not grant the Commission any authority to circumvent the requirements of section 453.5 that govern the use of these funds. Section 701 provides that "[t]he commission may supervise and regulate every public utility in the State and may do all things, whether specifically designated in this part or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction." Past decisions of this court have rejected a construction of section 701 that would confer upon the Commission powers contrary to other legislative directives, or to express restrictions placed upon the Commission's authority by the Public Utilities Code. (See, e.g., *Pacific Tel. & Tel. Co.* v. *Public Util. Com.* (1965) 62 Cal.2d 634, 653 [44 Cal.Rptr. 1, 401 P.2d 353] ["Whatever may be the scope of regulatory power under this section, it does not authorize disregard by the commission of express legislative directions to it, or restrictions upon its power found in other provisions of the act or elsewhere in general law."].)

In the context of the present case, section 453.5 constitutes one of the express legislative directives and restrictions upon the Commission's regulatory authority clearly mandating that a ratepayer refund be paid to the ratepayers of a public utility. Thus, the statutory grant of authority under

[10]Several statutes authorizing the imposition of penalties by the Commission under a variety of circumstances expressly require that any moneys collected pursuant to these provisions be deposited in the General Fund. (See, e.g., § 1033.5, subd. (b) [Commission-imposed penalty for abuse of an operating right must be deposited in the Transportation Reimbursement Account in the General Fund]; § 2100 [authorizing the Commission to impose a penalty against common carriers that have undercharged for transportation services, and requiring that such penalty be deposited in the General Fund]; §§ 2104, 2104.5 [authorizing the Commission to recover penalties in any civil action filed in the superior court in the appropriate city or county, and providing that all fines and penalties recovered by the state in such an action are to be deposited in the General Fund].)

The Public Utilities Code also contains a number of penalty provisions that do not specify the use of the penalty funds (see, e.g., §§ 2107, 2107.5, 2111, 2115). The Commission on occasion has recognized that in accordance with the legislative policy expressed in sections 2100 and 2104, the penalties assessed under these provisions must be deposited in the General Fund. (See *TURN* v. *PacBell* (1994) Cal. P.U.C. Dec. No. 94-04-057 at p. 18 [penalty imposed under sections 701 and 2107 ordered deposited in General Fund "[i]n accordance with [Public Utilities] Code Section 2104"].)

section 701 does not authorize the Commission to divert a substantial portion of the interest component of a ratepayer refund for a purpose entirely different from payment to the ratepayers. Instead, the Legislature expressly has barred the Commission from retaining ratepayer refunds, by mandating disbursement of such funds either to the ratepayers (§ 453.5) or, through escheat, to the General Fund (Code Civ. Proc., § 1519.5).

■    For all of the above reasons, we conclude the Commission exceeded its authority, and violated section 453.5, by attempting to divert a portion of the ratepayer refund for a purpose other than a direct refund to the customers of Pacific Bell.

### DISPOSITION

Decision Nos. 94-08-030 and 95-01-019 are ordered annulled insofar as they dispose of the funds held in the Pacific Telesis account other than as ratepayer refunds to be distributed pursuant to section 453.5, and the matter is remanded to the Commission for further proceedings consistent with our opinion. Petitioners shall recover their costs from the Commission. (See rule 26(a), Cal. Rules of Court.)[11]

Kennard, Acting C. J., Arabian, J., Baxter, J., Boren, J.,* Chin, J.,† and Sills, J.,‡ concurred.

---

[11]Concurrently with its request that the court take judicial notice of designated matters (see fn. 6, *ante*), the Commission filed an application "for a lifting of the stay of further Commission action," seeking to reopen the proceedings relating to the disbursement of the monies in the Pacific Telesis account in order to respond to Assembly Bill Nos. 1302 and 1519, 1995-1996 Regular Session. By this decision, the matter is remanded to the Commission for further proceedings consistent with our opinion.

*Presiding Justice, Court of Appeal, Second Appellate District, Division Two, assigned by the Acting Chairperson of the Judicial Council.

†Presiding Justice, Court of Appeal, First Appellate District, Division Three, assigned by the Acting Chairperson of the Judicial Council.

‡Presiding Justice, Court of Appeal, Fourth Appellate District, Division Three, assigned by the Acting Chairperson of the Judicial Council.