Filed 4/22/19

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>RAUL BENJAMIN NOVOA,<br><br>    Defendant and Respondent. | D074888<br><br><br><br>(Super. Ct. No. FVA018874) |

APPEAL from an order of the Superior Court of San Bernardino County, John Nho Trong Nguyen, Judge. Affirmed.

Michael A. Ramos, District Attorney, and Brent J. Schultze, Deputy District Attorney, for Plaintiff and Appellant.

Anne Lai for Defendant and Respondent.

In March 2003, Raul Benjamin Novoa pled guilty to possession of methamphetamine for sale (Health & Saf. Code, § 11378). The trial court sentenced him to 180 days in county jail and three years' probation. In 2012, the United States began deportation proceedings against Novoa, which are continuing today.

In May 2017, Novoa moved to vacate his 2003 conviction per Penal Code[1] section 1473.7.  After a lengthy evidentiary hearing, the trial court granted Novoa's motion.

The People appeal, contending the trial court erred in (1) holding Novoa's trial counsel to a duty the law did not require and (2) finding Novoa suffered prejudice.  In support of the People's position, they assert the superior court's factual findings were not supported by substantial evidence.  Moreover, they argue laches prohibits Novoa's motion.

We conclude the People's arguments are without merit, and thus, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Guilty Plea

The record of Novoa's guilty plea and the underlying circumstances of his offense are less than clear.  There is no reporter's transcript of the hearing wherein Novoa pled guilty.  The preliminary hearing transcript, police reports, and probation report present differing versions of Novoa's actions and statements leading to his arrest.  Suffice it to say, Novoa was arrested on January 13, 2003, and charged with possession for sale of a controlled substance (methamphetamine) in violation of Health and Safety Code section 11378, possession of a deadly weapon (brass knuckles) in violation of section 12020, subdivision (a)(1), and vandalism-graffiti in violation of section 594, subdivision (b)(4).

---

1    Statutory references are to the Penal Code unless otherwise specified.

On March 13, 2003, Novoa pled guilty to one count of possession for sale of a controlled substance as part of a plea agreement. Per that agreement, the district attorney agreed, in exchange for the guilty plea, that Novoa would be sentenced to 180 days in county jail, followed by three years' probation. In addition, the district attorney dismissed the remaining counts. As part of his guilty plea, Novoa signed a written change of plea form in which he, among other things, waived certain rights. The form also was signed by Novoa's trial counsel, Sean O'Connor.

As relevant here, the plea form contained a standard immigration advisal (paragraph 14). O'Connor modified paragraph 14 by crossing out the word "or" and handwriting the word "and" in its place and crossing out the word "may" and handwriting the word "will" in its place. The modified paragraph 14 read, "I understand that if I am not a citizen of the United States, deportation, exclusion from admission to the United States, ~~or~~ *and* denial of naturalization ~~may~~ *will* result from a conviction of the offense(s) to which I plead guilty/nolo contendere (no contest)." In addition to Novoa signing the change of plea form, O'Connor signed it as well. In doing so, O'Connor acknowledged that he was Novoa's attorney, he personally read and explained the contents of the change of plea form to Novoa, he observed Novoa sign the form, and he concurred with Novoa's guilty plea.

The trial court sentenced Novoa consistent with the plea agreement.

Motion to Vacate

On May 14, 2012, Novoa was convicted of being a felon in possession of a firearm (former § 12021, subd. (a)(1)).  Based on that conviction,[2] as well as the conviction in this case, deportation proceedings were initiated.

On May 19, 2017, Novoa moved, under section 1473.7, to vacate his 2003 conviction.  He argued that he pled guilty at the insistence of his trial counsel, which was "disasterous [*sic*] from an immigration law perspective."  Novoa further alleged O'Connor did not explain the gravity of the plea and did not take any steps to defend against the immigration consequences of the conviction.  In support of his position, Novoa maintained that there existed a "long line of California court cases establishing a Sixth Amendment duty on the part of defense counsel to (1) advise of the specific immigration consequences of a criminal conviction, and (2) defend against those consequences by attempting to negotiate an alternative disposition that would not carry such harmful consequences."

The People opposed the motion, asserting that, in 2003, a criminal defense attorney was not required to provide immigration advice to a client and the record established that Novoa knew or should have known that his conviction could have

---

2    Due to changes in federal law, Novoa's conviction for being a felon in possession of a firearm is no longer a deportable offense.  (See *United States v. Aguilera-Rios* (9th Cir. 2014) 769 F.3d 626, 635-636.)  Nevertheless, possession of methamphetamine for sale remains a deportable offense.  (See 8 U.S.C. §§ 1101(a)(43)(B), 1227(a)(2)(A)(iii) & (B)(i).)

4

immigration consequences. The People also contended that even if O'Connor deficiently represented Novoa, Novoa was not prejudiced.

The superior court heard evidence in support of and in opposition to Novoa's motion. To this end, Novoa, O'Connor, Julie Wu (a law student at UC Irvine School of Law), Michael Mehr (an expert witness for Novoa), and Adelina Garcia (Novoa's mother) testified.

Novoa was born in Mexico but came to the United States when he was five or six years old. His mother, stepfather, and siblings live in the United States as well. Novoa became a lawful permanent resident of the United States through the Special Immigrant Juveniles program of the United States Citizenship and Immigration Services.

Novoa was living in foster care when he was arrested in 2003. He was 18 years old. He remembered appearing in court three or four times in connection with his 2003 arrest. He met O'Connor, his counsel, the second time he appeared in court. Novoa never met with O'Connor outside of court.

Novoa remembered two plea offers conveyed by O'Connor. The first was an offer to plead guilty in exchange for a prison sentence of two to three years. Novoa rejected this offer.

Regarding the plea offer Novoa did accept, Novoa recalled receiving that offer the third time he appeared in court. He observed O'Connor talking to the prosecutor for a few minutes and then walking over to Novoa to present him with the offer. At that time, O'Connor had the written "plea bargain in his hands." Upon presenting Novoa with the plea offer, O'Connor advised him that if he "didn't fucking sign the plea bargain that [he]

5

would end up going to prison, and [O'Connor] would no longer help [him]." Novoa stated that O'Connor "used a pretty tough tone" and "looked a bit frustrated." Novoa explained that O'Connor was frustrated with him because he did not want to accept the offer. He did not want to "accept the sales charge." Novoa testified that O'Connor did not explain what impact pleading guilty would have on Novoa's immigration status. Novoa also stated that O'Connor did not discuss the possibility of pleading to a charge other than possession with the intent to sell to make it less likely that Novoa would be deported. Additionally, O'Connor did not talk to Novoa about any plea deals other than the two he conveyed from the prosecutor.

Novoa accepted the plea offer on the same day it was offered. Novoa stated that O'Connor did not give him any instructions on filling out the plea agreement. Instead, O'Connor just told him to " '[i]nitial all the unmarked boxes.' " Novoa said that he did not understand the plea agreement. He tried to look over it, but he "could not understand anything of it," and as such, he did not read it. Novoa testified that he asked O'Connor what "something meant" in the plea agreement, but O'Connor told him "not to worry about it, just to initial all the unmarked boxes." Novoa explained that it took "under a minute" to fill out the paperwork and that he felt "pretty rushed."

Novoa testified that if he had known of the immigration consequences of accepting the plea offer in 2003, he would not have pled guilty. At the time he pled guilty, Novoa had just become a father. Also, in addition to his newborn son, his family (siblings and mother) lived in the United States.

6

Novoa was detained by immigration authorities in 2012 and remained detained for two and a half years. Novoa never considered agreeing to deportation because his family lives in the United States, and he knows no one in Mexico.

On cross-examination, Novoa admitted that he told O'Connor that he did not want to go to prison. He also agreed that he did not tell O'Connor that he was a Mexican citizen. And Novoa did not ask O'Connor about the immigration consequences of his conviction.

O'Connor testified that he has been a criminal defense attorney since 1999. Over his career, O'Connor has handled thousands of cases and taken 40 to 50 cases to trial. When asked about representing Novoa, O'Connor stated that he had "very vague recollections of the case, but [he did] not remember this case for the most part." However, O'Connor stated that he did explain the portion of the change of plea form discussing the immigration consequences of pleading guilty (paragraph 14). He testified that he modified the sentence in paragraph 14, and as such, "that would have been a direct indication that immigration was an issue and that he and [Novoa] discussed it." He also said that it was his recollection that the particular judge who took Novoa's guilty plea would have specifically addressed paragraph 14 because it was modified. Thus, the judge would have drawn Novoa's attention to the modified paragraph 14.

Although O'Connor did not provide any specific detail regarding his discussions with Novoa about immigration issues, he stated that he would not have modified paragraph 14 with "different charges or if immigration to a particular client was not an issue." O'Connor then clarified his "practice was to advise [about immigration

7

consequences], regardless, but [he knew] there could be situations—if it wasn't a concern, [he would not] discuss[] it directly."

O'Connor explained his general approach to representing a client who was pleading guilty per a plea agreement. He indicated that he would review the change of plea form with his client to make sure he or she understood the contents of the form as well as the consequences of a conviction. If a client asked him about anything on the form, O'Connor said that he would "take the time to go ahead and explain or provide additional information on whatever the question pertained to." O'Connor stated that he would review police reports with a client and provide an honest assessment of the strength of the client's case. O'Connor maintained that he would never pressure a client to accept a plea agreement or rush him to complete the change of plea form quickly. He denied telling Novoa that he needed to sign the plea agreement or he would go to prison and O'Connor would no longer help him.

Regarding immigration issues, O'Connor was asked what he would have done, in 2003, if a client told him that he did not want to be deported. In responding to the question, O'Connor indicated that "[t]he normal practice would have been to identify if there was an immigration issue" as to "any client." In other words, O'Connor did not distinguish between a client who told him that immigration was an issue and a client who did not. He further explained what he would do after he determined "immigration was in play":

> "If there was a situation where they were not undocumented or they
> were not a permanent resident, whatever it may have been, and
> immigration was an issue, the first step that we would have been

8

attempting to do was obviously to balance the criminal punishment against what criminal consequences would have been. [¶] I do not recall what specific attempts I would have made in this case, but I know my practice would have been to start from a dismissal, to work my way to a non drug-related offense. [¶] And if I couldn't get it out of a non drug-related offense, then to get it to where it would be considered as not an aggravated felony or something that didn't involve moral turpitude. [¶] There would have been a litany of back and forth on what those charges or what the attorney would have entertained, and ultimately you would be forced with 'This is what the District Attorney is offering.' "

O'Connor stated in a case like the instant matter, if he was trying to avoid immigration consequences, he would have tried to get the charge for possession of methamphetamine for sale dismissed so the defendant could plead to something else. O'Connor clarified what he would have done to avoid the immigration consequences:

"The normal procedure for me at that time [2003], and even today, is to get it out of the drug area completely. [¶] I would have been discussing pleading—primarily the way I do it now too—would have been some type of a [section 32]. That would have been trying to remove it from drugs, trying to remove it from any other consideration on moral turpitude or becoming an aggravated felony. [¶] The aggravated felony part would have been taken care of in terms of what the jail time would have been. So I would imagine [section 32] would have been discussed. [¶] If we couldn't get it out of the drug territory and we were in drug territory, that would have meant again—I don't mean to dismiss the negotiations from a criminal side—so you would have been discussing misdemeanor treatment, diversion treatment, [Proposition] 36 treatment. [¶] You would have discussing [*sic*] trying to substitute the charge. No question—you would have been trying—you would have been dealing with a lesser included offense of simple possession. [¶] That would have been another one of the very first things on a criminal side that would have opened the door to having that pled to, to a misdemeanor. [¶] We would have had a diversion or [Proposition] 36 eligibility in that realm. I know a common practice for us at the time was also trying to discuss it to 'nonspecific,' meaning we would just plead to it and not reference the actual particular controlled substance. [¶] You would also try to do

9

transportation.  I think at that point in time transportation would have included personal use and that we would have specifically done a[] [Health and Safety Code section] 11379 with personal use in there.  That would have been attempts that we would have been making.  [¶]  I know the push combining the two would have been to have it in the [Health and Safety Code section] 11377 and have misdemeanor treatment if we could do it."

In addition, O'Connor testified that, in 2003, the prosecutors in Fontana "were not that interested in giving alternative dispositions that would have assisted in immigration consequences unless the case or circumstances warranted it somehow."

O'Connor indicated that it was his practice to note in writing any plea offers and why a defendant rejected an offer.  His notes usually were kept in the case file.  However, he could not recall if he kept any such notes in Novoa's case because there were no notes in the file, and O'Connor did not have any notes in his possession relating to the instant matter.  Despite the lack of notes in the file indicating what other offers might have been made, O'Connor testified that he would have asked the prosecutor to dismiss the case against Novoa.  When the prosecutor did not agree, he then stated he would have asked the prosecutor to agree to possession for personal use.  Yet, when he was questioned about the specifics of the instant matter, O'Connor reiterated that he did not remember this case.  That said, he emphasized that his normal procedure would have been to see what lesser included offenses the prosecutor was willing to consider and then evaluate the immigration consequences of those offenses.

Observing that O'Connor was speaking in general terms, the trial court asked him what specifically he told the prosecutor in the instant matter regarding possible pleas. O'Connor responded:

10

"I don't remember what I would have told the [district attorney] in this case. I'm telling you what my normal practice would have been. [¶] I would have been counteroffering for misdemeanors. I would have been counteroffering, if immigration is an issue, transportation on a[] [Health and Safety Code section] 11379 for personal use. I would have been counteroffering for some accessory after the fact. I would have been doing those kind of things as a general rule."

Mehr testified as an expert witness on behalf of Novoa. At the time of his testimony, Mehr had been an attorney for about 37 years. He specializes in immigration consequences of criminal convictions and postconviction relief. Mehr opined that, in 2003, "reasonably competent attorneys" would advise their clients of the immigration consequences for specific convictions. In addition, the attorneys would advise their clients regarding what pleas or strategies would be available to avoid "immigration disaster[s]." Mehr also testified that O'Connor could have explored other possible plea agreements to allow Novoa to avoid immigration consequences.

Wu, a student at UC Irvine School of Law, testified that she took notes during a telephone conversation between O'Connor and members of UC Irvine's Immigrant Rights Clinic (Clinic). Among other topics, Wu stated that O'Connor was "evasive and a little defensive" when he was asked about immigration consequences of narcotics charges.

After hearing the testimony of the various witnesses at the hearing, entertaining oral argument, and considering the motion, opposition, supplemental briefing, and the admitted evidence, the superior court granted Novoa's motion. In doing so, the court issued a lengthy written order. In that order, the court found "[t]he objective evidence" indicated "very little interaction between . . . O'Connor and . . . Novoa." Specifically, the court determined that O'Connor first met Novoa on January 27, 2003 when the public

defender declared a conflict, and O'Connor was appointed Novoa's attorney. On that day, O'Connor presented Novoa with an offer from the prosecutor of two to three years in prison in exchange for a guilty plea. Novoa rejected the offer. O'Connor then announced that he was ready for the preliminary hearing, which was set to occur three days later. The court emphasized the lack of any attempt to negotiate on behalf of Novoa: "[O'Connor] testified that since the case was set for [preliminary hearing], it means the negotiation went nowhere. It is only reasonable to see that the negotiation merely began, if there was such a negotiation, on his first appearance as the attorney of record for Novoa, when there was no evidence to indicate that Mr. O'Connor had asked and educated himself about his client. It is reasonable to assume that Mr. O'Connor knew little to nothing about his client as a person. Yet he announced ready for [preliminary hearing] to be held three days later."

The court found that the third and last meeting between O'Connor and Novoa occurred on March 13, 2003, at a pretrial proceeding. Novoa observed O'Connor talking to the prosecutor and then presented a plea offer of 180 days in county jail and three years' probation if Novoa pled guilty to possession of methamphetamine with intent to sell. After Novoa agreed to accept the plea, O'Connor presented him with a change of plea form. The court found Novoa's testimony credible that O'Connor did not review the plea form with Novoa and did not adequately explain it, especially the portion discussing the immigration consequences of entering the plea. Implicit in the superior court's findings is that it believed Novoa's testimony that he only skimmed through a few paragraphs of the change of plea form and did not understand most of the form. In

12

addition, when Novoa asked O'Connor about portions of the change of plea form, O'Connor told him not to worry about it, initial the various boxes, and sign the form.

The court did not find O'Connor credible. It noted that O'Connor's testimony at the evidentiary hearing was not clear regarding his practice of changing the plea form regarding the immigration consequences of pleading guilty. The court also found that during his interview with students from the Clinic, which occurred several months before the evidentiary hearing, O'Connor "was unclear, and somewhat confused as to his practice or at least did not show that he had a clear understanding of the intricacies and nuances in immigration consequences in regard to different drug offenses."

The court pointed out that O'Connor testified that he reviewed the Continuing Education of the Bar practice guide, *Criminal Law Procedure and Practice* (Criminal Law CEB), "commonly referred to as the 'Bible' for the criminal defense practitioners in California," and other books after his interview with the Clinic and before his evidentiary hearing testimony. The court noted "that [O'Connor's] testimony in . . . [the] evidentiary hearing seem[ed] to track the suggested procedure detailed in the CEB book." However, the court found that "O'Connor still did not show he now had a full grasp of the immigration treatments in different drug offenses and the potential remedies afforded the" legal permanent resident versus an "undocumented person charged with deportable crimes."

The court was concerned that O'Connor did not recall what he discussed with Novoa about immigration consequences of a guilty plea. Nevertheless, based on the handwritten changes to paragraph 14 of the change of plea form, O'Connor believed

13

immigration must have been a concern. The court was not persuaded by O'Connor's testimony, noting that O'Connor did not explain: (1) the nature of the concerns, (2) the origin of those concerns, (3) the reason for those concerns, and (4) what O'Connor did to address those concerns. In fact, the court noted that it asked O'Connor why he did not document such concerns and the discussions he had with Novoa if immigration was an important issue. The court found O'Connor's answers to the question "lawyerlike, unsatisfactory and unconvincing." Moreover, the court was vexed by the "astonishing absence of any notes, documentation regarding the history of the case, the progress of negotiation between [O'Connor] and the [prosecutor], [and] any discussion between [O'Connor] and [Novoa]" in the client file O'Connor produced.

The superior court also concluded there existed a duty in 2003 on behalf of defense counsel to advise defendants of the potential immigration consequences of pleading guilty. In reaching this conclusion, the court relied on *People v. Soriano* (1987) 194 Cal.App.3d 1470 (*Soriano*), *People v. Barocio* (1989) 216 Cal.App.3d 99 (*Barocio*), and *People v. Bautista* (2004) 115 Cal.App.4th 229 (*Bautista*). The court also emphasized that, in 2002, there were "multiple publications," including the Criminal Law CEB that contained a chapter entitled, "Representing the Non-Citizen Criminal Defendant," which discussed the issues involved in the defense of noncitizen defendants and a defense counsel's duty in such representations. Finally, the court found persuasive Mehr's opinion that the standard of practice for a criminal defense attorney, as of 2002, included investigating the nature of the charges and all the consequences of a plea to

14

those charges while considering not only the direct criminal consequences but also the immigration consequences.

The court thus found that O'Connor provided ineffective assistance of counsel. O'Connor's representation of Novoa fell below an objective standard of reasonableness because O'Connor failed to discuss the immigration consequences of pleading guilty. In addition, the court found that Novoa was prejudiced by O'Connor's deficient representation. Thus, the court ultimately concluded that Novoa did not plead guilty with a meaningful understanding and knowing acceptance of the actual and potential adverse immigration consequences of his plea.

The People timely appealed.

DISCUSSION

I

APPEALABILITY

As a threshold matter, Novoa contends the order granting his motion for relief under section 1473.7 is not appealable. To address this issue, we must interpret subdivision (f) of section 1473.7.

In construing statutes, we determine and effectuate legislative intent. (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1007; *People ex rel. Younger v. Superior Court of Alameda County* (1976) 16 Cal.3d 30, 40.) To ascertain intent, we look first to the words of the statutes. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387; *Woodhead*, at p. 1007.) "Words must be construed in context, and

statutes must be harmonized, both internally and with each other, to the extent possible." (*California Mfrs. Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 836, 844.)

Subdivision (f) of section 1473.7 provides: "An order granting or denying the motion is appealable under subdivision (b) of Section 1237 as an order after judgment affecting the substantial rights of a party." Here, clearly the statute contemplates an order denying or granting a motion to be appealable. And we see no limitation in that subdivision that would prevent the People from appealing the order granting Novoa's motion. However, Novoa asserts that section 1473.7, subdivision (f) refers only to an order being appealable "under subdivision (b) of section 1237" and that subdivision applies only to a defendant. (See § 1237, subd. (b).) Although he acknowledges that subdivision (f) of section 1473.7 refers to an order denying or granting a motion to be appealable, Novoa insists such language supports his interpretation that only a defendant may appeal. Thus, he points out there could be an occasion when a defendant, who successfully moves under section 1473.7, would want to appeal an order granting the motion because a court might have granted "a vacatur on one ground but not to others or on one count or sentence but not others in the case." We are not persuaded.

Clearly, the Legislature wrote section 1473.7 with the intent that an order granting or denying a motion under that section would be appealable. (See § 1473.7, subd. (f).) Although the reference to section 1237, subdivision (b) might cause some confusion,[3] we note that the People may appeal any order made after judgment, affecting their substantial

---

[3] That subdivision addresses appellate rights of a defendant. (See § 1237.)

16

rights. (§ 1238, subd. (a)(5).) An order allowing a defendant to withdraw his guilty plea after his conviction affects the substantial rights of the People. As such, the subject order in the instant action is appealable.

## II

## SECTION 1473.7

### A. The People's Contentions

The People challenge the superior court's order granting Novoa's motion under section 1473.7 for two primary reasons. First, they argue the court erred in holding O'Connor to a standard for criminal defense that did not exist in 2003. Second, they argue the court erred in finding O'Connor provided ineffective assistance of counsel. In the alternative, the People maintain they have been prejudiced by Novoa's delay in bringing his motion, and as such, laches should apply.

### B. Standard of Review

Novoa correctly notes that, in general, the standard of review for an order on a motion to withdraw a guilty plea is abuse of discretion. (See *People v. Fairbank* (1997) 16 Cal.4th 1223, 1254.) However, Novoa's motion was based on his claim of ineffective assistance of counsel, which implicates a constitutional right. Therefore, in a case like this that presents a mixed question of fact and law, we must independently review the order. (See *People v. Olvera* (2018) 24 Cal.App.5th 1112, 1116 (*Olvera*).) We defer to the trial court's factual findings if supported by substantial evidence and exercise our

17

independent judgment to decide whether the facts demonstrate deficient performance and resulting prejudice.[4] (*Ibid.*)

## C. The Scope of Criminal Defense Counsel's Duties Regarding Immigration Issues in 2003 in This Matter

The parties disagree whether professional norms in 2003 imposed on criminal defense counsel an affirmative duty to investigate and advise on immigration issues. Below, the superior court found such a duty, ultimately concluding that O'Connor had a duty to provide Novoa "with the appropriate understanding of the immigration consequences [Novoa] would face if he took the offer to plead guilty to [possession of methamphetamine for sale]." The trial court reached this conclusion based on *Soriano*, *supra*, 194 Cal.App.3d 1470, *Barocio*, *supra*, 216 Cal.App.3d 99, and *Bautista*, *supra*, 115 Cal.App.4th 229, as well as the testimony of Mehr and practice guides and American Bar Association (ABA) standards discussing the standard of practice of handling criminal cases involving immigration consequences.

The People argue the court's conclusion was incorrect. They contend, in 2003, a criminal defense attorney in California had no affirmative duty to give any immigration advice at all, only a duty to avoid giving incorrect advice as set forth in *In re Resendiz*

---

4   We are aware that at least one appellate court has concluded that we can make independent findings of fact in reviewing an order granting or denying a section 1473.7 motion. (See *People v. Ogunmowo* (2018) 23 Cal.App.5th 67, 79.) The court in *Ogunmowo* was addressing the circumstance where the trial court makes factual findings based on declarations, noting the trial court and the appellate court "are in the same position in interpreting written declarations." (*Ibid.*) Here, the trial court heard live testimony. As such, the trial court was in a much better position to consider the evidence in the first instance and make credibility determinations. We will not reweigh evidence here, but will defer to the trial court's factual findings if supported by substantial evidence instead.

18

(2001) 25 Cal.4th 230 (*Resendiz*). In support of their position, the People maintain that *Soriano*, *Barocio*, and *Bautista* do not establish any affirmative duty for a criminal defense attorney to provide his or her client with immigration advice. Further, the People argue this duty only changed when the United States Supreme Court issued its opinion in *Padilla v. Kentucky* (2010) 559 U.S. 356 (*Padilla*) seven years after Novoa pled guilty.

In *Padilla*, the court determined that a criminal defense counsel's Sixth Amendment obligations include properly advising his or her client of the immigration consequences of a guilty or no contest plea. The court recognized that federal immigration law is often complex; thus, at times, deportation as a consequence of a conviction is neither clear nor certain. In those cases, the court concluded, the most the Sixth Amendment may require of defense counsel concerning immigration consequences is a warning that a criminal conviction may have adverse immigration consequences. (*Padilla*, *supra*, 559 U.S. at p. 369.) However, when, as was the case in *Padilla*, federal immigration law specifies in "succinct, clear, and explicit" terms that a conviction will result in deportation, the Sixth Amendment requires the criminal defense attorney to accurately advise his or her client of that consequence before the client enters a guilty plea. (*Padilla*, at pp. 368-369.)

Before *Padilla*, federal and state courts had been divided on a counsel's Sixth Amendment obligation to advise on the immigration consequences of a conviction. But most courts had concluded no such duty existed at all. (See *Chaidez v. United States* (2013) 568 U.S. 342, 353 (*Chaidez*).) The few courts that had recognized ineffective assistance of counsel claims involving immigration advice limited their holdings to

19

affirmative misstatements by counsel, declining to reach the issue whether a mere failure to warn of immigration consequences also could result in finding ineffective assistance. (See *Padilla*, *supra*, 559 U.S. at p. 369; *Resendiz*, *supra*, 25 Cal.4th at p. 240.)  Yet, the United States Supreme Court made clear that to provide effective assistance of counsel, "counsel must inform her client whether his plea carries a risk of deportation."  (*Padilla*, at p. 374.)

Three years after *Padilla*, the United States Supreme Court explained that *Padilla*, *supra*, 559 U.S. 356 created new law.  In *Chaidez*, *supra*, 568 U.S. 342, the court determined that *Padilla* had had the effect of suddenly changing the nature of immigration issues from being "collateral consequences" of pleas to something unique, roughly akin to direct consequences.  (*Id.* at p. 349.)  The court concluded that *Padilla* had created a new affirmative obligation on trial counsel to understand and accurately explain the immigration consequences of a plea to a defendant before the entry of that plea where no such duty had existed before.  This rule was not based on prevailing professional standards but, rather, on a determination that immigration consequences were potentially so profound that trial counsel had an obligation to accurately advise their clients about them.  (See *id.* at p. 353.)  Therefore, the court in *Chaidez* held that, under the rules set out in *Teague v. Lane* (1989) 489 U.S. 288, the *Padilla* opinion could not be applied retroactively to cases that were final at the time the opinion in *Padilla* was issued. (*Chaidez*, at pp. 344, 358.)

Here, the parties agree *Padilla* is not retroactive.  Accordingly, Novoa's ineffective assistance of counsel claim is governed by the Sixth Amendment obligations as they

20

existed at the time of Novoa's plea in 2003.  (See *Olvera*, *supra*, 24 Cal.App.5th at p. 1115.)  Not surprisingly, the parties disagree about what the Sixth Amendment mandated in this case.

Even well before *Padilla*, California courts had rejected the collateral consequences doctrine as a bar to ineffective assistance of counsel claims for immigration related advice.  (See *Resendiz*, *supra*, 25 Cal.4th at p. 240 [opting not to announce a categorical bar to immigration based ineffective assistance of counsel claims, the court determined that "affirmative misadvice regarding immigration consequences can in certain circumstances constitute ineffective assistance of counsel"].)

In *Resendiz*, the defendant, a legal permanent resident of the United States, asked his counsel whether his plea to a drug trafficking charge, an aggravated felony, would affect his legal residency.  According to the defendant's petition for writ of habeas corpus, his counsel had assured him at the time he entered his plea he would have " 'no problems with immigration' " except that he would not be able to become a United States citizen.  In a declaration submitted by the Attorney General in response to the defendant's petition for writ of habeas corpus, the defendant's trial counsel stated he did not remember what he had actually told the defendant but that it was his custom and practice to explain to noncitizen clients " 'that a guilty plea is likely to [a]ffect . . . the client's ability to become a citizen.  I also tell these clients that I make the assumption that the federal government is always wanting to deport non-citizen felons.  I explain to them they should assume the government has a policy to deport people in their position.' " (*Resendiz*, *supra*, 25 Cal.4th at p. 238.)

Based on the record before it, the court noted that it was "not able to determine with certainty whether counsel conformed to his purported custom and habit or . . . he supplemented any customary warning with a more specific, but incorrect, advisement." (*Resendiz*, *supra*, 25 Cal.4th at pp. 252-253.)  However, the court determined that it did not have to resolve that conflict because the defendant had not shown he was prejudiced (i.e., he would have rejected the plea offer had he been properly warned).  (*Id.* at pp. 253-254.)

The court expressly declined to reach "whether a mere failure to advise could also constitute ineffective assistance."  (*Resendiz*, *supra*, 25 Cal.4th at p. 240.)  Because the issue was not squarely before it, the court also declined to address defense counsel's obligation to research immigration consequences, though it expressly doubted the Sixth Amendment imposed "a blanket obligation on defense counsel, when advising pleading defendants, to investigate immigration consequences or research immigration law." (*Resendiz,* at pp. 249-250.)

In the instant matter, the People argue *Resendiz* established that, before *Padilla*, immigration consequences were collateral in nature.  (See *Resendiz*, *supra*, 25 Cal.4th at p. 242.)  Thus, the People assert that in "2001 there was not widespread agreement that criminal defense counsel had an affirmative duty to advise defendants about immigration consequences."

Novoa counters that the People's reliance on *Resendiz*, *supra*, 25 Cal.4th 230 is misplaced.  He notes that *Resendiz* predates Novoa's plea by two years; therefore, it could not establish the prevailing professional norms for defense counsel at the time he pled

22

guilty. We agree with Novoa that the holding of *Resendiz* does not resolve the issue before us. That said, the People are correct that *Resendiz* did not establish any duty on all criminal defense attorneys practicing in California to advise their clients about immigration consequences in 2003. Indeed, it does not and could not stand for that proposition because that was not the issue before it. (See *Powers v. City of Richmond* (1995) 10 Cal.4th 85, 147 ["Judicial decisions are of course authority for what they actually decide; we do not readjust their holdings to incorporate claims not asserted or considered therein."].) By the same token, the People overstate the impact of *Resendiz* by arguing it prohibited the trial court in the instant matter from finding O'Connor had a duty to provide Novoa with the appropriate understanding of the immigration consequences of his guilty plea. The court in *Resendiz* specifically declined to reach whether a failure to advise regarding immigration issues could constitute ineffective assistance of counsel. (*Resendiz*, at p. 240.) And, although it noted that immigration consequences are considered collateral, it concluded that the " 'collateral' nature of immigration consequences does not foreclose [an] ineffective assistance of counsel claim." (*Id.* at p. 243.)

Although *Resendiz* does not provide us with the necessary guidance in this matter, Novoa asserts *Soriano*, *supra*, 194 Cal.App.3d 1470, *Barocio*, *supra*, 216 Cal.App.3d 99, and *Bautista*, *supra*, 115 Cal.App.4th 229 do. We do not share Novoa's expansive reading of these cases.

In *Soriano*, the defendant claimed that he asked his attorney if he would be deported if he pled guilty. The attorney responded in the negative. Subsequently, the

23

defendant asked his attorney whether a guilty plea would prohibit him from obtaining citizenship. The attorney responded that it would not and reiterated that he would not be deported. (*Soriano*, *supra*, 194 Cal.App.3d at p. 1478.) The defendant's attorney asserted that she told her client that he " 'could' " be deported if he pled guilty. (*Id.* at p. 1479.) The court concluded the attorney's advice was erroneous and counsel had undertaken no effort to obtain accurate information, despite being asked about the immigration consequences of a guilty plea. (*Id.* at p. 1482.) The court determined that this erroneous advice constituted ineffective assistance of counsel because, when asked, trial counsel had an obligation to research further and provide accurate information. (*Ibid.*) However, *Soriano* did not establish that defense counsel had a duty to research and advise the defendant of his immigration consequences as a general matter. Instead, it stands for the proposition that when asked by a client about the immigration consequences of a plea, the attorney has an obligation to obtain correct information and advise the client based on that information. Here, there is no indication in the record that Novoa asked his counsel repeatedly, let alone once, about the immigration consequences of a guilty plea. In this sense, *Soriano* is not instructive here.

*Barocio*, *supra*, 216 Cal.App.3d 99, similarly did not create an independent pre-*Padilla* duty to advise defendants of immigration consequences of their pleas. In that case, the defendant's trial attorney failed to seek a judicial recommendation against deportation. (*Barocio*, at p. 103.) There was no issue about counsel's advice to the defendant. Indeed, the court in *Barocio* specifically concluded that while section 1016.5 imposed a duty on the court to warn of the possible immigration consequences of a plea,

24

counsel had no corresponding duty because immigration concerns were "collateral consequence[s]" of the plea. (*Barocio*, at pp. 107-108.) The only deficiency found in *Barocio* was trial counsel's failure to advise the defendant of the right to a recommendation against deportation, a special mechanism that existed under federal law at that time. (*Id.* at pp. 109-110.) The case was remanded to the trial court for resentencing to allow counsel to confer with his client regarding requesting a judicial recommendation against deportation and carry out the client's wishes. (*Id.* at p. 111.) Novoa makes no similar complaint here.

Finally, although more like the instant matter than *Soriano* and *Barocio*, *Bautista*, *supra*, 115 Cal.App.4th 229, ultimately, is not helpful here. The evidence in *Bautista* showed that the defense attorney's strategy was simply to bargain for "the most lenient sentence possible." (*Id.* at p. 238.) However, an immigration attorney provided a declaration as an expert witness that in at least five cases in which he was personally involved, the prosecutor agreed to allow a defendant charged with drug sales to " 'plead upward,' " defined as pursuing a negotiated plea for a violation of a greater offense that would carry a longer prison sentence but not result in deportation. (*Ibid*.) The defense attorney never contemplated such a strategy. (*Ibid*.) And the expert witnesses opined that the defense attorney's representation of the defendant fell below objective standards of reasonableness. (*Id.* at pp. 239-240.) The appellate court issued an order to show cause to the trial court for a reference hearing to take evidence and resolve factual issues relating to defense counsel's legal advice at the time of the defendant's guilty plea. (*Id.* at p. 242.)

25

Ostensibly, the instant matter and *Bautista* appear similar. In fact, the same expert witness who testified in *Bautista* (Mehr) also testified in the evidentiary hearing below. However, a critical difference between Mehr's testimony in *Bautista* and the instant matter involves his testimony about the availability to plead up to a greater offense to avoid negative immigration consequences. In *Bautista*, Mehr testified about five occasions in which he was involved where the district attorney allowed a defendant to plead guilty to a greater offense to avoid deportation. (*Bautista*, *supra*, 115 Cal.App.4th at p. 240.) Further, the court's analysis in that case focused on the premise that there was a reasonable probability the prosecutor and trial court would have been amenable to allowing the defendant to plead up to a nonaggravated felony and avoid deportation. (*Id.* at pp. 240-242.) Here, there was no such evidence before the trial court. Mehr did discuss greater offenses to which Novoa could have pled guilty, but he provided no evidence that the prosecutor would have accepted those pleas to allow Novoa to avoid deportation. Indeed, Mehr admitted that he had never handled a case in San Bernardino County and was not familiar with the courthouse in Fontana. Moreover, there is no suggestion in *Bautista* that trial counsel had a pre-*Padilla* duty to research and explain immigration consequences to their clients. Finally, as the opinion in *Bautista* was issued after Novoa entered his guilty plea, O'Connor could not have referred to that case for guidance on his obligation to discuss the immigration consequences of the guilty plea with Novoa.

In summary, we are not persuaded that *Soriano*, *supra*, 194 Cal.App.3d 1470, *Barocio*, *supra*, 216 Cal.App.3d 99, and *Bautista*, *supra*, 115 Cal.App.4th 229 create a

general duty for a criminal defense attorney, in 2003, to discuss the immigration consequences of a guilty plea. That said, those three cases are consistent with our high court's refusal to announce a categorical bar to immigration based ineffective assistance of counsel claims. (See *Resendiz*, *supra*, 25 Cal.4th at p. 240.) In other words, *Soriano*, *Barocio*, and *Bautista* present specific circumstances wherein a defendant may successfully bring an immigration based ineffective assistance of counsel claim pre-*Padilla*.

In addition to California case law, the trial court found that O'Connor had a duty to advise Novoa on immigration consequences of his guilty plea based on ABA standards, various practice guides from 2002 (especially the Criminal Law CEB), and Mehr's testimony. The People do not challenge the trial court's reliance on the ABA standards or the practice guides, but they do argue the court erred in relying on Mehr's testimony. Specifically, the People argue that Mehr's testimony was improper because he could not testify about a defense counsel's duty to a client, appropriate negotiation strategies of a defense attorney or that O'Connor had rendered deficient representation of Novoa.

Citing *Summers v. A. L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, the People claim Mehr could not testify about a defense counsel's duty to a client because such a duty is a question of law. Their reliance on *Summers* is misplaced. That case did not involve an expert witness testifying about a defense counsel's duty to a client. Instead, the expert testified about "issues of law . . . almost too numerous to list." (*Id.* at p. 1185.) These included opinions that a defendant was hauling corn illegally, a certain contract was illegal, and a defendant was liable based on the actions of another defendant. (*Ibid.*)

27

Here, the People do not point to any portion of Mehr's testimony that is like the expert's testimony in *Summers*. To the contrary, "California law holds that expert testimony is admissible to establish the standard of care applicable to a lawyer in the performance of an engagement and whether he has performed to the standard[.]" (*Wright v. Williams* (1975) 47 Cal.App.3d 802, 810; see *Strickland v. Washington* (1984) 466 U.S. 668, 688 (*Strickland*) ["The proper measure of attorney performance remains simply reasonableness under prevailing professional norms."].) There was nothing improper about Mehr testifying regarding the practice among reasonably competent defense attorneys in 2003 based on his experience, observations, training, knowledge, education, and skills. (See Evid. Code, § 720.)

Likewise, we are not troubled by Mehr's testimony about possible negotiation strategies that O'Connor could have used in representing Novoa. Mehr opined that a criminal defense attorney had a duty to advise his or her client regarding what pleas or strategies would be available to avoid "immigration disaster[s]." Mehr then testified about possible plea agreements that would have allowed Novoa to avoid immigration consequences. Such testimony was not an application of Mehr's opinion of the law to the facts of the case. He merely offered possible plea agreements that O'Connor could have pursued. He did not opine that O'Connor would have been successful in negotiating those pleas. Nor did he opine that the prosecution would have been receptive to any such offers. Moreover, the People were able to cross-examine Mehr regarding the hypothetical pleas as well.

28

Finally, the record does not support the People's claim that Mehr testified that O'Connor rendered deficient representation of Novoa in this case. The prosecutor objected to a question asking Mehr to opine whether O'Connor provided ineffective assistance of counsel. The court asked Novoa's counsel to rephrase the question, noting that it was for the court to decide whether O'Connor's representation of Novoa fell below the "norm of practice." Ultimately, Novoa's counsel rephrased the question, per the court's guidance, to ask Mehr what he observed about O'Connor's representation of Novoa. The prosecutor did not object to that question. Simply put, Mehr did not testify that O'Connor rendered deficient performance as claimed by the People here. Thus, the trial court did not err in relying on Mehr's testimony.

To summarize, we agree with the People that *Soriano*, *supra*, 194 Cal.App.3d 1470, *Barocio*, *supra*, 216 Cal.App.3d 99, and *Bautista*, *supra*, 115 Cal.App.4th 229 are not instructive here. Yet, we disagree with the People that the trial court erred in relying on Mehr's testimony. Further, we see no problem with the trial court also considering practice guides and the ABA guidelines to determine the prevailing professional norms in 2003. (See *Padilla*, *supra*, 559 U.S. at p. 366, citing *Strickland*, *supra*, 466 U.S. at p. 688 ["We long have recognized that '[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . . .' "].) Yet, we are left with the question of whether Mehr's testimony along with practice guides and the ABA standards are sufficient for the trial court to find O'Connor had a duty in 2003 to discuss immigration consequences with Novoa.

29

Although the People do not take issue with practice guides and the ABA standards in general, they argue those materials cannot trump case law. Specifically, they argue that *Resendiz*, *supra*, 25 Cal.4th 230 prohibited the trial court from finding any duty to discuss immigration consequences here. (See *id.* at pp. 249-250 ["We are not persuaded that the Sixth Amendment imposes a blanket obligation on defense counsel, when advising pleading defendants, to investigate immigration consequences or research immigration law."].) We do not disagree that, in 2001, pre-*Padilla*, the Sixth Amendment did not require criminal defense counsel to investigate immigration consequences or research immigration law when advising pleading defendants. Yet, our agreement on this point does not end our analysis of the trial court's determination here.

The Sixth Amendment does not specify the specific requirements of effective assistance of counsel. (See *Strickland*, *supra*, 466 U.S. at p. 688.) Instead, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." (*Ibid.*) Below, Mehr testified about the prevailing professional norms for criminal defense attorneys in representing noncitizen defendants in 2003.

Mehr has been a practicing attorney since 1976 with about 37 years of criminal law and immigration experience. He has written "the leading treatise on immigration and criminal law" entitled *Defending Immigrants in the Ninth Circuit*, and he was the update editor and coauthor of "chapter 52" in the Criminal Law CEB entitled *Defending*

30

*Noncitizen Defendants.*[5]  Mehr also has frequently given lectures and presentations to the criminal defense bar, mainly in Santa Cruz, California, but also in Southern California and San Francisco.  Specifically, Mehr has lectured the criminal defense bar on immigration consequences of criminal convictions since "around 1987."  He was the expert in *Bautista*, *supra*, 115 Cal.App.4th 229 and served as an expert witness on a criminal defense attorney's duty regarding immigration issues in Santa Cruz County.  Additionally, Mehr has "submitted expert witness declarations for cases throughout the state of California."  However, Mehr admitted that he had never handled any case in San Bernardino County and was not familiar with the Fontana courthouse.  That said, in forming his opinions in this case, Mehr stated that he talked to two criminal defense attorneys who had practiced criminal defense law in San Bernardino County in 2003.[6]

Mehr opined that, in 2003, a "reasonably competent attorney . . . would advise [his or her client] of what the immigration consequences would be for a specific conviction.  [He or she] would also advise [the client] about what pleas or strategies would be available to avoid that immigration—an immigration disaster."  Mehr based his opinions on his interactions with criminal defense counsel, ABA standards, case law, statutory changes, and practice guides.

---

[5]  Mehr testified that in the edition of the Criminal Law CEB in effect at the time Novoa pled guilty, the relevant chapter was 48.

[6]  During cross-examination of Mehr, he admitted that the two attorneys he consulted regarding the practice in San Bernardino County were based in Los Angeles, but claimed the attorneys told him that the standards in Los Angeles and San Bernardino were the same.  Nevertheless, Mehr conceded that he did not know how much either attorney practiced in San Bernardino County.

31

The trial court found Mehr persuasive, noting his "impressive resume" and "experiences through his work and interaction with criminal bars." The court also quoted from section 48 of the Criminal Law CEB as it existed in 2002:

> "[A] defense attorney's goal is always to seek a result that avoids creating a ground of inadmissibility or deportability or an outcome that could result in a bar to potential future immigration relief. The first step in analyzing a case is to find out the defendant's current or potential immigration status, this information is necessary to identify the specific immigration effects of a disposition. Counsel must investigate the client's immigration status, research the immigration law, and inform the client very specifically about potential consequences. In addition, counsel must actively attempt to avoid unfavorable consequences if possible. Anything less constitutes ineffective assistance of counsel." (Cal. Criminal Law: Procedure and Practice (Cont.Ed.Bar 2002), § 48.1, p. 1356.)

Although the parties here disagree whether the trial court properly relied on Mehr's opinion or if Mehr's testimony could establish the professional norms that existed in San Bernardino County in 2003, we are struck by the one person who appears to agree with Mehr's opinions: O'Connor, Novoa's counsel when he pled guilty in 2003.

O'Connor predominately practiced in the Fontana courthouse in 2003. He was on the conflict panel at that time. When asked by the People how he would have handled a situation in 2003 wherein a client told him he or she did not want to be deported, O'Connor responded that his "normal practice would have been to identify if there was an immigration issue[,]" and he would have "started with any client" "to determine if immigration was in play." Thus, O'Connor went beyond the call of the People's question and stated his beginning point, with any client in 2003, was to determine if immigration issues existed. Indeed, in discussing the modifications to paragraph 14 of the change of

32

plea form, O'Connor stated "normally the practice was to advise, regardless, but I know there could be situations—if it wasn't a concern, we weren't discussing it directly." Again, the concern O'Connor is emphasizing is immigration. He is confirming his typical practice was to discuss immigration issues, if they existed.

Moreover, O'Connor testified that his practice in 2003 included "balance[ing] the criminal punishment against what criminal consequences would have been." He also testified extensively about what attempts he would make in negotiating a plea when immigration was at issue. However, he stated that the prosecutors he dealt with in Fontana in 2003 "were not that interested in giving alternative dispositions that would have assisted in immigration consequences unless the case or circumstances warranted it somehow."

O'Connor testified that when he first started practicing law in 1999, he was working in an office with about seven other defense attorneys as well as working in the courthouse with at least four other attorneys. He characterized the attorneys in his office as "senior criminal defense attorneys." He said he learned how to handle criminal cases from these attorneys, who "on a regular basis" gave him "guidance and assistance[.]" He also stated that he was introduced to the Criminal Law CEB at that time, which he referred to as his "bible."

Against this backdrop, it is clear we are faced with a unique case. The People correctly maintain that there existed no published California case, at the time Novoa pled guilty, wherein a court held a criminal defense attorney had a duty to discuss the immigration consequences arising out of a plea deal. But the record contains expert

33

testimony that a reasonable criminal defense attorney, in 2003, would have advised a noncitizen criminal defendant about the immigration consequences of his or her guilty plea. And, O'Connor, the very criminal defense counsel whose actions are at issue here, testified that his practice, in 2003, was to identify if immigration was an issue for "any client[,]" and if it was, balance the criminal punishment with the criminal consequences, and attempt to negotiate a plea deal that would avoid immigration consequences. Further, O'Connor stated he learned how to handle criminal cases and his strategy from "senior criminal defense attorneys" and the Criminal Law CEB. Although O'Connor does not recall any specific details regarding the instant matter, he did modify paragraph 14 of the change of plea form; thus, he believes immigration was an issue in Novoa's case and must have been discussed. Yet, the trial court found that O'Connor did not adequately review the change of plea form with Novoa, and that finding is supported by substantial evidence.

Although Mehr's testimony coupled with O'Connor's testimony may point toward the potential of a more robust obligation on behalf of criminal defense attorneys that might have existed in 2003, on the record before us, we need not make such a sweeping proclamation. Nor can we.[7] Based on the specific facts of the case, it is apparent that, in

---

7   We emphasize that we do not base our conclusion on *Padilla*, *supra*, 559 U.S. 356 because that case was decided seven years after Novoa pled guilty in this matter. (See *Chaidez*, *supra*, 568 U.S. at pp. 344, 358 [concluding *Padilla* did not apply retroactively].) Instead, we rely on the evidence in the record of the prevailing professional standards in San Bernardino County, and more specifically, the Fontana courthouse within that county in 2003. That said, we discourage any broad reading of this opinion and caution against an application of the instant matter to a case that does not

the Fontana courthouse in San Bernardino County, criminal defense attorneys, in 2003, had the practice of advising noncitizen defendants consistent with paragraph 14 of the change of plea form.

### D.  Ineffective Assistance of Counsel

To show that trial counsel's performance was constitutionally defective, an appellant must prove:  (1) counsel's performance fell below the standard of reasonableness under prevailing professional norms, and (2) the "deficient performance prejudiced the defense."  (*Strickland, supra,* 466 U.S. at pp. 687-688.)

Below, the trial court found that O'Connor's performance fell below the standard of reasonableness under the prevailing professional norms, namely that O'Connor did not adequately explain to Novoa the immigration consequences of pleading guilty.  The People disagree.  They argue that to the extent O'Connor had a duty to inform Novoa he would be deported, he did so as evidenced by the modification of paragraph 14 and O'Connor's testimony that he must have talked to Novoa about immigration issues.  However, the People's argument overlooks the factual findings of the trial court.

The court found Novoa credible.  Specifically, it believed Novoa when he testified that O'Connor did not adequately review or explain the change of plea form.  Further, the court noted that Novoa did not recall any discussions with O'Connor about the

share the same facts.  We are not holding that a criminal defense attorney, in 2003, had a duty to investigate and discuss all immigration consequences related to the offenses charged against a defendant.  We do not conclude that, in 2003, a criminal defense attorney had the duty to attempt to negotiate a plea bargain that would reduce the immigration consequences of a plea.  It might be that such duties existed then, but that determination cannot be reached on the record before us.

immigration consequences of pleading guilty. The court also did not find the modified paragraph 14 or Novoa's initials by paragraph 14 established that O'Connor informed Novoa regarding the immigration consequences of pleading guilty. The court explained:

> "Sometimes, a defendant who signed and initialed the boxes on the plea form, but having no clue what he or she was doing in terms of his rights and what all the consequences of his or her plea were [*sic*]. In those situation[s], it was either because counsel was too busy, and failed to treat the defendant as a person and not a statistic or the defendant only focused on the number of days, months or years in jail or prison and nothing else came to his or her mind."

Additionally, the court observed that there was "very little interaction" between O'Connor and Novoa. And the court appeared bothered that O'Connor claimed that "immigration must of been a concern" in representing Novoa, but there was no documentation in the file that O'Connor discussed any such concerns with Novoa or attempted to address such concerns in negotiating a plea agreement. Simply put, the trial court did not believe that O'Connor discussed the immigration consequences of pleading guilty with Novoa.

The People claim that the trial court improperly shifted the burden of proof to them by focusing on the absence of evidence that O'Connor explained the "full immigration consequences" to Novoa. We disagree.

The People correctly point out that Novoa bears the burden of proof in support of his motion under section 1473.7. We agree with the trial court that Novoa satisfied this burden. He testified that he did not recall discussing any immigration consequences with O'Connor. He stated that he did not have time to read the change of plea form, and O'Connor did not take the time to discuss the form with him. The trial court found

36

Novoa credible. Additionally, the court noted that O'Connor and Novoa did not spend much time together, and there was no evidence that O'Connor attempted to negotiate any plea agreement with the prosecutor beyond simply relaying the prosecutor's two offers to Novoa. The trial court's comment about the "absence of evidence" appears to address the People's attempt to rebut Novoa's testimony and the other evidence proffered at the hearing in support of Novoa. For example, the court did not find O'Connor credible. O'Connor testified at length about how he handled immigration issues in 2003, but the court did not find any evidence that O'Connor took the steps that he claimed he would have taken. Thus, the court's comment about an absence of evidence explained how it viewed and weighed the evidence. It was not an indication that the court shifted the burden to the prosecution.

Likewise, we are not troubled by the court's reference to "full immigration consequences." The People claim the court does not explain this reference, arguing the court "did not expressly find that Mr. O'Connor failed to inform [Novoa] of the one critical immigration consequence: deportation. The plea form makes it clear that [Novoa] was in fact advised." This argument glosses over our standard of review. We defer to the court's factual findings if supported by substantial evidence. (*Olvera*, *supra*, 24 Cal.App.5th at p. 1116.) In conducting a substantial evidence review, we presume every inference in support of the order that the finder of fact could reasonably have made. We do not reweigh the evidence or reevaluate witness credibility. We cannot reverse the order merely because the evidence could be reconciled with a contrary finding. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

37

Below, the trial court found that Novoa did not plead guilty with a meaningful understanding and a knowing acceptance of the actual and potential adverse immigration consequences of his plea. It concluded that O'Connor did not effectively represent Novoa because he did not provide "his client with the appropriate understanding of the immigration consequences his client would face if he took the offer to plead guilty." The primary consequence of Novoa pleading guilty to possession of methamphetamine with the intent to sell was deportation. Thus, we must imply that the court found that O'Connor did not advise Novoa that he would be deported. Alternatively stated, the court did not find the change of plea form proved that O'Connor advised Novoa that he would be deported if he pled guilty.

Several aspects of the court's order support this finding. The court found "very little interaction between" O'Connor and Novoa. Novoa testified that O'Connor never explained the "immigration consequences that would befall upon him after his acceptance of the offer to plead guilty." The court observed that sometimes a defendant may sign and/or initial a change of plea form but has "no clue what he or she was doing in terms of his rights and what all the consequences of his or her plea were." Novoa testified that he did not read the change of plea form; he merely skimmed it. Also, Novoa stated that O'Connor did not explain the form and told Novoa just to sign. it. And the court found Novoa credible. The court did not find O'Connor believable, noting that O'Connor did not offer a credible explanation why there was no indication in the file that he ever discussed immigration consequences with Novoa. The People ignore this evidence and these findings, and essentially ask us to just consider the change of plea form. In this

38

sense, the People are asking us to reweigh the evidence. This we will not do. (*People v. D'Arcy*, *supra*, 48 Cal.4th at p. 293.)

The trial court's findings below chiefly relied on live testimony from O'Connor and Novoa. Because the trial court heard this evidence, it is in a much better position than this court to make credibility determinations. It is not the province of this court to second guess those determinations. (See *People v. Ferraez* (2003) 112 Cal.App.4th 925, 931.) The trial court concluded O'Connor did not properly discuss with Novoa the immigration consequences of pleading guilty, the most devastating of which was Novoa's deportation. Here, substantial evidence supports the trial court's finding that O'Connor's representation of Novoa fell below the standard of reasonableness under prevailing professional norms of criminal defense attorneys practicing in the subject Fontana courthouse.

Nonetheless, the People assert that even if O'Connor's representation of Novoa fell below the standard of reasonableness, Novoa's motion should have failed because he cannot show prejudice. In other words, Novoa did not prove it was reasonably probable he would have rejected the plea and "insisted, instead, on proceeding to trial" but for O'Connor's incompetence. (*Resendiz*, *supra*, 25 Cal.4th at p. 253; see *People v. Martinez* (2013) 57 Cal.4th 555, 559 (*Martinez*).) We disagree.

Courts determine prejudice on a case-by-case basis in light of all of the circumstances. (*Lee v. United States* (2017) __U.S. ___ [137 S.Ct. 1958, 1966] (*Lee*).) In making this determination in the context of a guilty plea involving immigration consequences, courts must consider the likelihood of success at trial, the potential

39

consequences after a trial compared to the consequences flowing from the guilty plea, and the importance of immigration consequences to the defendant. (See *Lee*, at pp. 1966-1967; *Martinez*, *supra*, 57 Cal.4th at pp. 564, 568.) Nonetheless, " '[s]urmounting *Strickland*'s high bar is never an easy task,' [citation], and the strong societal interest in finality has 'special force with respect to convictions based on guilty pleas.' [Citation.] Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." (*Lee*, at p. 1967.) "[T]he defendant bears the burden of establishing prejudice" and "must provide a declaration or testimony stating that he or she would not have entered into the plea bargain if properly advised. It is up to the trial court to determine whether the defendant's assertion is credible, and the court may reject an assertion that is not supported by an explanation or other corroborating circumstances." (*Martinez*, at p. 565.)

Below, the trial court found credible Novoa's testimony that he would not have accepted the plea offer if he understood the immigration consequences that awaited him after the plea. The court observed that Novoa came to the United States when he was only five or six years old and had never returned to Mexico. Shortly before he pled guilty in 2003, his son was born in the United States. In addition to his son, his mother, foster mother, brothers, sisters, aunts, uncles, and cousins all lived in the United States. Although Novoa was born in Mexico, he had no connection whatsoever to that country. The court explained:

40

"Unfortunately, in . . . Novoa's case, the picture that awaited him after the plea was . . . complete darkness and devastation compared to the maximum possible prison time he could face if he decided to go to trial and [was] found guilty on all charges. If we look at the disastrous immigration consequences that awaited him, we can see that any person in Nov[o]a's situation who had a meaningful understanding of such consequences would reasonabl[y] look at the 180 days in jail and three year probation as completely meaningless. The acceptance of said offer did not match with Novoa's wish that was alluded [to] in his own testimony and Mr. O'Connor's testimony, i.e., his wanting to go home with his family. Of course, it seems reasonable any prisoner would always want to get out of jail and be back to his family, if he had one. That is normal and understandable. But Novoa's desire[,] as suggested by Mr. O'Connor's testimony, coupled with the complete absence of any documentation or note in the client's file to show whether any explanation had been given to Novoa before he took the plea, gives strength and credibility to Novoa's claim that Mr. O'Connor had failed to explain to him in a meaningful way the immigration consequences awaiting him and that had Mr. O'Connor explained to him the disastrous immigration consequences that certainly and absolutely awaited him after the plea[,] he would not have accepted the offer to plead guilty."

Ignoring this portion of the trial court's order, the People insist there was "little contemporaneous evidence" that deportation was important to Novoa at the time he pled guilty in 2003. In making this assertion, they do not address the undisputed evidence of Novoa's connections to the United States and his lack of any link to Mexico (except for his birth). They do not discuss the fact that Novoa's son was born in the United States before he pled guilty. Instead, they conflate their prejudice argument with their previous contention that O'Connor's representation of Novoa did not fall below the applicable standard of reasonableness. To this end, the People argue Novoa has not shown prejudice because O'Connor modified paragraph 14, proving that he did, in fact, discuss with Novoa the immigration consequences of pleading guilty. As we highlight above, the

41

court made no such factual finding. To the contrary, the court did not find O'Connor credible in his claim that he had any immigration related discussions with Novoa. Further, the trial court believed Novoa that he did not read or understand the change of plea form. And the court found Novoa's testimony credible that O'Connor did not discuss the immigration consequences of pleading guilty. As such, we are not persuaded that the modified paragraph 14 undermines Novoa's claim of prejudice on the record before us.

The People also claim the trial court erred when it prohibited them from cross-examining Novoa about the facts of his offense.[8] They argue the underlying facts would show that Novoa did not have a plausible chance of an acquittal if he proceeded to trial (in lieu of pleading guilty). Under *Lee*, *supra*, 137 S.Ct 1958, the People contend Novoa's chances at trial are relevant in determining the existence of prejudice. Alternatively stated, the People maintain that Novoa cannot claim prejudice if he would have taken his case to trial, only to lose and be deported in any event. We disagree.

*Lee*, *supra*, 137 S.Ct. 1958 does not stand for the proposition that a defendant cannot show prejudice only if he or she had a reasonable chance to win at trial. In that case, the government argued that the defendant could not show prejudice because he was going to be deported either way; going to trial would only result in a longer sentence before the inevitable consequence. The United States Supreme Court was not persuaded, explaining that it did not agree with the government that it would be irrational for the defendant to reject a plea offer in favor of trial. (*Id*. at p. 1968.) The court clarified:

---

[8] A trial court has discretion to limit witness testimony. (See *People v. Trinh* (2014) 59 Cal.4th 216, 246.)

"But for his attorney's incompetence, Lee would have known that accepting the plea agreement would *certainly* lead to deportation. Going to trial? *Almost* certainly. If deportation were the 'determinative issue' for an individual in plea discussions, as it was for Lee; if that individual had strong connections to this country and no other, as did Lee; and if the consequences of taking a chance at trial were not markedly harsher than pleading, as in this case, that 'almost' could make all the difference. Balanced against holding on to some chance of avoiding deportation was a year or two more of prison time. [Citation.] Not everyone in Lee's position would make the choice to reject the plea. But we cannot say it would be irrational to do so." (*Id.* at pp. 1968-1969.)

The trial court below relied on *Lee* in finding that Novoa would have gone to trial, even if facing long odds of success, if there was a chance, albeit small, that Novoa could avoid deportation.[9] The People have offered no cogent argument showing the court erred in making this determination.

Finally, the People argue they were prejudiced by Novoa's delay, and laches should defeat Novoa's motion. For laches to apply, the People must demonstrate the existence of three elements. First, Novoa delayed in asserting a right or a claim. Second, the delay was not reasonable or excusable. Third, the People were prejudiced. (See *Magic Kitchen LLC v. Good Things Internat., Ltd.* (2007) 153 Cal.App.4th 1144, 1157.)

Regarding the first two elements of laches, the People point out that Novoa pled guilty in 2003 but did not seek relief until 2017. Further, they emphasize that Novoa did not earlier seek to withdraw his plea under section 1018 or file a petition for a writ of habeas corpus. The People's reliance on these other mechanisms to challenge the plea is

_____

9       The trial court noted that the evidence against Lee was "overwhelming, substantial and much more serious than Novoa's case." We agree. (See *Lee*, *supra*, 137 S.Ct. at p. 1963 [After a search of Lee's house, law enforcement found 88 ecstasy pills, three Valium tablets, $32,432 in cash, and a loaded rifle. Lee admitted the drugs were his.].)

43

misplaced. Novoa brought a motion under section 1473.7, which became effective on January 1, 2017. Section 1473.7 provided Novoa with new grounds on which to challenge his guilty plea. He could not have brought such a motion until after January 1, 2017. Novoa's motion was filed five months after the statute's effective date. The People do not argue this five-month "delay" was unreasonable. Consequentially, the People have not shown the first two elements of laches exist.

Likewise, we are not persuaded by the People's argument of prejudice. Although we are mindful of the difficulties facing the People in opposing a motion challenging a guilty plea that occurred over 14 years before the motion was filed, the Legislature saw fit to bestow these new rights on defendants, but also provided certain safeguards to protect the People.[10] (See *People v. Perez, supra*, 19 Cal.App.5th at p. 828.) The prejudice the People experienced in opposing the motion is a product of the new rights the Legislature conferred on defendants like Novoa. In other words, the prejudice is not a product of Novoa's delay in bringing his motion. In short, the People have provided no cogent argument that would allow us to apply the equitable defense of laches to thwart the new statutory rights the Legislature created.

In summary, we conclude the court did not err in granting Novoa's motion under section 1473.7. After independently applying the trial court's factual findings, which are supported by substantial evidence, to the law, we agree with the trial court that O'Connor

---

[10] These protections include that (1) any motion under section 1473.7 must be timely under the statute; (2) the defendant bears the burden of proof by a preponderance of the evidence; and (3) the court must specify the basis of its conclusion to grant or deny the motion. (See *People v. Perez* (2018) 19 Cal.App.5th 818, 828.)

44

was constitutionally ineffective in representing Novoa in 2003. Novoa pled guilty without a meaningful understanding and a knowing acceptance of the actual and potential adverse immigration consequences of his plea. Accordingly, he is entitled to relief under section 1473.7.[11]

## DISPOSITION

The order is affirmed.


HUFFMAN, Acting P. J.

WE CONCUR:


NARES, J.


GUERRERO, J.

---

[11] Because we find that O'Connor rendered constitutionally ineffective representation of Novoa, we do not reach the People's Equal Protection argument.

45